SO ORDERED,

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: May 24, 2019**

The Order of the Court is set forth below. The docket reflects the date entered.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

ON-SITE FUEL SERVICE, INC.,                                    CASE NO. 18-04196-NPO

ALLEGED DEBTOR.                                                            CHAPTER 7

MEMORANDUM OPINION AND ORDER ON
INVOLUNTARY PETITION AGAINST A NON-INDIVIDUAL; ON-SITE
FUEL SERVICE, INC.'S ANSWER TO INVOLUNTARY PETITION FOR
BANKRUPTCY AND COUNTERCLAIM UNDER 11 U.S.C. § 303(i); ANSWER AND
AFFIRMATIVE DEFENSES OF PETITIONING CREDITORS TO COUNTERCLAIM
UNDER 11 U.S.C. § 303(i); AND OBJECTIONS TO COUNTER-DESIGNATIONS
OF DEPOSITION EXCERPTS FILED BY PETITIONING CREDITORS AS
TO CERTAIN JOINING CREDITORS AND JARED PRENTISS [DKT. NOS. 132-140]

This matter came before the Court for trial on March 11-13, 2019 (the "Trial"), on the

Involuntary Petition Against a Non-Individual (the "Petition") (Dkt. 1) filed by the petitioning

creditor, Mansfield Oil Company of Gainesville, Inc. ("Mansfield"); the On-Site Fuel Service,

Inc.'s Answer to Involuntary Petition for Bankruptcy (the "Answer") and Counterclaim Under 11

U.S.C. § 303(i) (the "Counterclaim") (Dkt. 48) filed by the alleged debtor, On-Site Fuel Service,

Inc. (the "Alleged Debtor"); the Answer and Affirmative Defenses of Petitioning Creditors to

Counterclaim Under 11 U.S.C. § 303(i) (the "Reply") (Dkt. 54) filed by Mansfield, Clark C. Webb

("Webb"), Don Wood, Inc. ("Wood"), John M. Ellsworth Co., Inc. ("Ellsworth"), Northstar Fleet

Service, Inc. ("Northstar"), SCI Distribution, LLC ("SCI"), Werts Welding & Tank Service, Inc.

("Werts"), Wayside Truck and Trailer Repair, Inc. ("Wayside"), Titus Talent Strategies, LLC, Knowles On Site Repair, Inc. ("Knowles"), Professional Datasolutions, Inc. ("PDI"), M&M Tire & Mechanical Services, Inc. ("M&M"), and ESI Supply, LLC ("ESI") (collectively, the "Petitioning Creditors"); and the Objections to Counter-Designations of Deposition Excerpts Filed by Petitioning Creditors as to Certain Joining Creditors and Jared Prentiss *[Dkt. Nos. 132-140]* (the "Evidentiary Objections")[1] (Dkt. 149) filed by the Alleged Debtor in the above-referenced involuntary chapter 7 proceeding (the "Involuntary Proceeding"). The Court entered the Joint Pretrial Order (Dkt. 142) on March 6, 2019, and it entered the Amended Joint Pretrial Order (Dkt. 143) that same day. At Trial, Kristina M. Johnson represented the Alleged Debtor, and Douglas C. Noble ("Noble") and Ward Thomas McCraney, III represented the Petitioning Creditors. During the Trial, the Petitioning Creditors and the Alleged Debtor (collectively, the "Parties") introduced into evidence 123 stipulated exhibits. Additionally, the Petitioning Creditors introduced into evidence two (2) exhibits, and the Alleged Debtor introduced into evidence seven (7) exhibits.[2] The Petitioning Creditors presented the testimony of two (2) witnesses: Jack McGlinn ("McGlinn"), the chairman of the board of the Alleged Debtor (Dkt. 143 at 29), and John Byrd ("Byrd"), the chief financial officer of Mansfield (Dkt. 143 at 29). The Alleged Debtor presented the testimony of four (4) witnesses: McGlinn; Byrd; Mindy Goth ("Goth"), the manager

---

[1] The Court deferred ruling on the Evidentiary Objections during Trial and instead will provide its rulings on the Evidentiary Objections later in this Opinion.

[2] Hereinafter, exhibits introduced into evidence at Trial by the Parties are cited as "(Stipulated Ex. __)", exhibits introduced into evidence at Trial by the Petitioning Creditors are cited as "(PC Ex. __)", and exhibits introduced into evidence at Trial by the Alleged Debtor are cited as "(AD Ex. __)".

of Traverse, LLC ("Traverse")[3]; and Albert Altro ("Altro"), the managing director of Traverse.[4] Further, the Petitioning Creditors submitted to the Court the deposition testimony of Jared Prentiss ("Prentiss"), the former president of the Alleged Debtor (Stipulated Ex. 112); and the Alleged Debtor submitted to the Court the deposition testimony of Prentiss, Byrd, ESI, Knowles, M&M, Northstar, PDI, SCI, Wayside, and Werts (Stipulated Exs. 103-112).  The Court, having considered the pleadings, evidence, and arguments of counsel, finds as follows:[5]

### Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and/or (O).  Notice of the Trial was proper under the circumstances.

### Facts

1.      On October 30, 2018 (the "Petition Date"), Mansfield filed the Petition under chapter 7 of the United States Bankruptcy Code (the "Code") against the Alleged Debtor.

2.      On November 26, 2018, the Alleged Debtor filed the Motion to Dismiss Involuntary Petition and Request for Money Judgment Against Petitioning Creditor for Costs, Attorneys' Fees and Damages (the "Motion to Dismiss") (Dkt. 9) and the Brief in Support of Motion to Dismiss Involuntary Petition and Request for Money Judgment Against Petitioning Creditor for Costs, Attorneys' Fees and Damages (the "Alleged Debtor Brief") (Dkt. 10).

---

[3] Test. of Goth at 10:52:48 – 10:53:25 (Mar. 13, 2019).  The Trial was not transcribed. References to the argument and testimony presented at Trial are cited by the timestamp of the audio recording.

[4] Test. of Altro at 1:36:25 – 1:36:28 (Mar. 13, 2019).

[5] The Court makes the following findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

3.      On November 28, 2018, the Alleged Debtor filed the Motion to Restrict Public Access and to File Amended Exhibit (the "Motion to Restrict") (Dkt. 14).

4.      On November 29, 2018, the Court entered the Order Granting Motion to Restrict Public Access and To File Amended Exhibit (Dkt. 16).  The next day, the Court entered the Amended Order Clarifying Restriction of Public Access (Dkt. 18), providing that the Motion to Dismiss "in its entirety is now inaccessible to the public" because the Alleged Debtor asked the Court in its Motion to Restrict to "specifically restrict public access to a certain exhibit attached to the [Alleged Debtor]'s Motion to Dismiss [Dkt. #9] previously filed with the Court."  (*Id.*)  The Court directed the Alleged Debtor to re-file the Motion to Dismiss with a redacted version of the specified exhibit.

5.      On November 30, 2018, the Alleged Debtor filed the Motion to Dismiss Involuntary Petition and Request for Money Judgment against Petitioning Creditor for Costs, Attorneys' Fees and Damages (the "Amended Motion to Dismiss") (Dkt. 19).

6.      On December 12, 2018, Webb; Wood; Ellsworth; Northstar; SCI; and Werts filed the Motion to Approve Joinder in Involuntary Petition (the "Motion to Approve Joinder") (Dkt. 26).

7.      On December 18, 2018, Mansfield filed the Response to Motion to Dismiss (the "Response") (Dkt. 33) and the Brief in Support of Response to Motion to Dismiss (the "Mansfield Brief") (Dkt. 34).

8.      On December 20, 2018, the Court held a status conference (the "Status Conference") on the Involuntary Proceeding, the Amended Motion to Dismiss, and the Motion to Approve Joinder.  At the Status Conference, the Court instructed the parties to submit an agreed order detailing the scope of the hearing set for January 10, 2019, on the Amended Motion to

Dismiss; the Alleged Debtor Brief; the Response; the Mansfield Brief; and the Motion to Approve Joinder (the "Hearing"), and instructed Mansfield to amend the Motion to Approve Joinder so that it would include all creditors seeking to join the Petition.

9.      On December 20, 2018, the Petitioning Creditors, excluding PDI, M&M, and ESI who had not yet joined in the Petition, filed the Amended Motion to Approve Joinder in Involuntary Petition (the "Amended Motion to Approve Joinder") (Dkt. 39), in which nine (9) creditors total sought to join the Petition.

10.     On December 21, 2018, the Court entered the Agreed Order (Dkt. 40), providing that the Court would determine at the Hearing whether to recognize the bar-to-joinder doctrine and whether the Amended Motion to Dismiss should be treated as one filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure or Rule 12(b)(6) of the Federal Rules of Civil Procedure as converted to a motion for summary judgment under Rule 12(d) and Rule 56 of the Federal Rules of Civil Procedure.[6]  The Agreed Order also noted that the Alleged Debtor should file a response to the Amended Motion to Approve Joinder, limited to the above issues, on or before January 2, 2019, and Mansfield should file a reply on or before January 9, 2019.

11.     On January 2, 2019, the Alleged Debtor filed the On-Site Fuel Service, Inc.'s Objection to Amended Motion to Approve Joinder in Involuntary Petition *[Dkt. #39]* (Dkt. 43).

12.     On January 8, 2019, Mansfield filed the Reply Brief in Support of Motion to Approve Joinder (Dkt. 44).

13.     On January 10, 2019, the Court held the Hearing and ruled from the bench, declining to adopt the judicially created bar-to-joinder doctrine and finding that 11 U.S.C.

---

[6]  These rules are made applicable to the Involuntary Proceeding by Rules 1018, 7012, 7056, and 9014 of the Federal Rules of Bankruptcy Procedure.

§ 303(b)'s requirements are nonjurisdictional. The Court memorialized and supplemented its bench ruling in the Memorandum Opinion and Order Granting Amended Motion to Approve Joinder in Involuntary Petition and Denying Motion to Dismiss Involuntary Petition and Request for Money Judgment Against Petitioning Creditor for Costs, Attorneys' Fees and Damages (the "Opinion Granting Amended Motion to Approve Joinder and Denying Motion to Dismiss") (Dkt. 52).

14.     On January 11, 2019, the Court issued the Scheduling Order (Dkt. 46), setting deadlines to file an answer to the Petition and to complete discovery and dates to submit a pretrial order and for a trial on the Petition.

15.     On January 16, 2019, the Alleged Debtor filed the Answer and the Counterclaim. In the Counterclaim, the Alleged Debtor asserted "that it is entitled to a judgment against all Petitioning Creditors for costs and attorney's fees under 11 U.S.C. § 303(i)(1) and against . . . Mansfield under 11 U.S.C. § 303(i)(2)." (Dkt. 48 at 4).

16.     On January 30, 2019, PDI filed the Joinder in Petition for Involuntary Bankruptcy (Dkt. 51). PDI filed the Amended Joinder in Petition for Involuntary Bankruptcy (Dkt. 67) on February 15, 2019.

17.     On January 31, 2019, the Petitioning Creditors, excluding M&M and ESI who had not yet joined in the Petition, filed the Reply.

18.     On February 4, 2019, M&M filed the Joinder in Petition for Involuntary Bankruptcy (Dkt. 56).

19.     On February 20, 2019, ESI filed the Joinder in Petition for Involuntary Bankruptcy (Dkt. 89).

20.    On February 25, 2019, the Alleged Debtor filed the Motion to Disallow Joinder of ESI Supply, LLC (the "Motion to Disallow Joinder of ESI") (Dkt. 99), asserting that the Court should prevent ESI from joining in the Petition "because its attempt to join the involuntary petition is untimely and incompatible with the discovery schedule established by the . . . Scheduling Order." (*Id.*)

21.    On February 26, 2019, the Petitioning Creditors filed the Response to Motion to Disallow Joinder of ESI Supply, LLC (Dkt. 104), asserting that the Court decided the issue raised in the Motion to Disallow Joinder of ESI in the Opinion Granting Amended Motion to Approve Joinder and Denying Motion to Dismiss when it declined to adopt the bar-to-joinder doctrine and that 11 U.S.C. § 303(c) unambiguously provides for joinder after the filing of a petition but before the court dismisses a bankruptcy case or enters an order for relief.

22.    On February 28, 2019, the Court issued the Order Denying Motion to Disallow Joinder of ESI Supply, LLC (Dkt. 114), permitting ESI to join in the Petition and extending the deadlines for discovery and the submission of the pretrial order contained in the Scheduling Order.

23.    On March 6, 2019, the Court entered the Joint Pretrial Order (Dkt. 142). That same day, the Court entered the Amended Joint Pretrial Order (Dkt. 143).

24.    On March 11, 2019, the Alleged Debtor filed the Proposed Findings of Fact and Conclusions of Law Submitted by Alleged Debtor, On-Site Fuel Service, Inc. (Dkt. 148), and the Petitioning Creditors filed the Proposed Findings of Fact and Conclusions of Law Submitted by Petitioning Creditors (Dkt. 150). That same day, the Alleged Debtor also filed the Evidentiary Objections (Dkt. 149).

25.    The Court conducted the Trial on March 11-13, 2019 and set the Parties' closing arguments for April 3, 2019. After the close of the Trial and closing arguments, the Alleged Debtor

filed the Amended Proposed Findings of Fact and Conclusions of Law Submitted by Alleged Debtor, On-Site Fuel Service, Inc. (Dkt. 156), and the Petitioning Creditors filed the Revised Proposed Findings of Fact and Conclusions of Law Submitted by Petitioning Creditors (Dkt. 157).

**Discussion**

A single creditor, Mansfield, commenced the Involuntary Proceeding by filing the Petition and asserting that it is eligible to file the Petition under 11 U.S.C. § 303(b),[7] that the Alleged Debtor may be the subject of an involuntary case under § 303(a), and that the Alleged Debtor generally is not paying its debts as they become due pursuant to § 303(h).  Mansfield further alleged in the Petition that it holds a claim of $6,386,390.63 against the Alleged Debtor.  Brad Puryear, general counsel of Mansfield, signed the Petition on behalf of Mansfield, and Noble signed the Petition as counsel for Mansfield in the Involuntary Proceeding.  The Parties do not dispute that the Alleged Debtor may be the subject of an involuntary case under § 303(a). Accordingly, the issues at Trial were: (1) whether the Petitioning Creditors were eligible to file the Petition under § 303(b); and (2) whether the Alleged Debtor generally was not paying its debts as they became due pursuant to § 303(h).  The Court will address each issue in turn.

**A.      Section 303(b): Do the Petitioning Creditors have standing to file the Petition?**

Section 303(b) requires at least three (3) petitioning creditors to commence an involuntary proceeding when there are at least twelve (12) creditors eligible to petition.  *See* 11 U.S.C. § 303(b)(1).  Each petitioning creditor must be "a holder of a claim against [the alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount." *Id.*  Additionally, the noncontingent, undisputed claims must total at least $15,775.00 "more than

---

[7] Hereinafter, all code sections refer to the Code found at Title 11 of the United States Code, unless otherwise noted.

the value of any lien on property of the debtor securing such claims."[8]  *Id.*  In the Opinion Granting Amended Motion to Approve Joinder and Denying Motion to Dismiss, this Court declined to adopt the judicially created bar-to-joinder doctrine.  As a result, twelve (12) creditors were allowed to join in the Petition with Mansfield.  The Court will not revisit that decision in this Opinion.

Courts use an objective standard to determine whether a claim is subject to a bona fide dispute.  *See Fustolo v. 50 Thomas Patton Drive, LLC*, 816 F.3d 1, 7 (1st Cir. 2016); *Crest One SpA v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 234-35 (2d Cir. 2015); *Riverview Trenton R.R. Co. v. DSC, Ltd. (In re DSC, Ltd.)*, 486 F.3d 940, 944 (6th Cir. 2007); *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 220-21 (5th Cir. 1993); *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir. 1991); *B.D.W. Assocs. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66-67 (3d Cir. 1989); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10th Cir. 1988); *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987).  The Fifth Circuit Court of Appeals ("Fifth Circuit") has held that bankruptcy courts "must 'determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt.'"  *In re Sims*, 994 F.2d at 221 (citing *In re Rimell*, 946 F.2d at 1365).  To do this, the petitioning creditor first "must establish a prima facie case that no bona fide dispute exists."  *Id.*  Next, "the burden shifts to the [alleged] debtor to present evidence demonstrating that a bona fide dispute does exist."  *Id.*  Under an objective standard, "neither the [alleged] debtor's subjective intent nor [its] subjective belief is sufficient to meet this burden."  *Id.*

---

[8]  The Judicial Conference of the United States adjusts the total amount required for noncontingent, undisputed claims every three (3) years.  *See* 11 U.S.C. § 104.  Effective April 1, 2019, the total amount required for noncontingent, undisputed claims is $16,750.00.  *See* 11 U.S.C. § 303(b).  Since Mansfield filed the Petition on October 30, 2018, the Court will use the monetary threshold that applies to cases commenced on or after April 1, 2016.

The Parties stipulate that nine (9) of the Petitioning Creditors, which does not include Mansfield, hold claims against the Alleged Debtor that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount (the "Stipulated Claims"). (Dkt. 156 at 28-29; Dkt. 157 at 18-19). The Parties further agree that the Stipulated Claims, in the aggregate, exceed the statutory threshold of $15,775.00. (*Id.*)

| Petitioning Creditor | Claim |
|---|---|
| Wood | $3,840.00 |
| Ellsworth | $18,720.20 |
| Northstar | $3,833.09 |
| Werts | $6,042.00 |
| Wayside | $13,026.26 |
| Knowles | $29,909.11 |
| PDI | $43,846.99 |
| M&M | $10,337.10 |
| ESI | $6,672.76 |
| **Total** | **$136,227.51**[9] |

(*Id.*) Despite this concession, the Alleged Debtor asserts that it disputes the Stipulated Claims "as to amount by the offsetting counterclaim of On-Site under Section 303(i)." (Dkt. 143 at 32). In

---

[9] While the Alleged Debtor and the Petitioning Creditors note that the total amount of these claims is $136,227.31 (Dkt. 156 at 29; Dkt. 157 at 19), the Court finds that the total amount is $136,227.51.

the Counterclaim, the Alleged Debtor "asserts that it is entitled to a judgment against all Petitioning Creditors for costs and attorney's fees under 11 U.S.C. § 303(i)(1)." (Dkt. 48 at 4). The Alleged Debtor further asserts that it is entitled to a judgment against Mansfield under § 303(i)(2) "for actual and punitive damages for knowingly and improperly filing the Involuntary Petition under the penalty of perjury in bad faith." (*Id.*) In support of this argument, the Alleged Debtor references *Credit Union Liquidity Services, L.L.C. v. Green Hills Development Company, (In re Green Hills Development Company)*, 741 F.3d 651, 657-60 (5th Cir. 2014), for the proposition that a dispute as to the amount of a claim includes "an offsetting counterclaim." (Dkt. 156 at 44); *see In re Green Hills Dev. Co.*, 741 F.3d at 657. In response, the Petitioning Creditors argue that a claim for relief under § 303(i) solely is a post-judgment remedy. (Dkt. 157 at 19); *see In re Onyx Telecomms., Ltd.*, 60 B.R. 492, 494 (Bankr. S.D.N.Y. 1985) (finding that a counterclaim for damages under § 303(i) is premature before dismissal of the petition).

While "Congress has made clear that a claimholder does not have standing to file an involuntary petition if there is a 'bona fide dispute as to liability or amount' of the claim," and the Fifth Circuit in *In re Green Hills Dev. Co.* has found that an offsetting counterclaim can create a bona fide dispute as to liability or amount, the mere assertion of a counterclaim that does not go to the merits of the claimholder's claim does not necessarily give rise to a bona fide dispute of the amount of the claim. *In re Green Hills Dev. Co.*, 741 F.3d at 660; *see* 2 COLLIER ON BANKRUPTCY ¶ 303.11[1] (16th ed. 2019). Indeed "[a] counterclaim arising out of a different transaction (and hence not creating a right of recoupment) does not evidence the existence of a bona fide dispute." 2 COLLIER ON BANKRUPTCY ¶ 303.11[1]. Here, the Counterclaim arises out of § 303(i), which provides that "*[i]f the court dismisses a petition* under this section . . . the court may grant judgment against the petitioners and in favor of the debtor for . . . costs; or . . . a reasonable attorney's fee."

11 U.S.C. § 303(i)(1) (emphasis added).  Additionally, *if the court dismisses a petition* it may grant judgment "against any petitioner that filed the petition in bad faith, for . . . any damages proximately caused by such filing; or . . . punitive damages."  11 U.S.C. § 303(i)(2).  The Counterclaim, therefore, is contingent upon this Court dismissing the Petition and is separate and distinct from the transactions giving rise to the Stipulated Claims.  Accordingly, the Court finds that the Stipulated Claims are not the subject of a bona fide dispute as to amount.

The Alleged Debtor further asserts that the Petitioning Creditors holding the Stipulated Claims should be disqualified under § 303(b) because they joined the Petition in bad faith given that they did not have independent knowledge, as of the Petition Date, that the Alleged Debtor generally was not paying its debts as they came due.  (Dkt. 143 at 32).  In other words, the Alleged Debtor sets forth a "legal theory" (Dkt. 143 at 33) that a creditor may not join in an involuntary petition if it does not have such independent knowledge at the time a petition is filed and that the Court "may disqualify a petitioning creditor that otherwise satisfies the requirements of Section 303(b) . . . for bad faith as an equitable remedy."  (Dkt. 143 at 33).  In response, the Petitioning Creditors argue that an independent-knowledge requirement tied to the date of a petition does not exist under § 303(b) "or any other provision of the Bankruptcy Code and that the Court lacks the power, equitable or otherwise, to deny a petitioning creditor the rights expressly provided for in the Bankruptcy Code."  (*Id.*)

The Court finds that the Alleged Debtor's legal theory is nothing more than a repackaged and relabeled version of the bar-to-joinder doctrine that this Court previously rejected in the Opinion Granting Amended Motion to Approve Joinder and Denying Motion to Dismiss.  As stated previously, § 303(b) provides:

(b)      An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

> (1)    by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least [$15,775] more than the value of any lien on property of the debtor securing such claims held by the holders of such claims; . . .

11 U.S.C. § 303(b)(1). Additionally, § 303(c) provides that "[a]fter the filing of a petition . . . but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent . . . may join in the petition with the same effect as if such joining creditor were a petitioning creditor." 11 U.S.C. § 303(c). The Court finds its ruling in the Opinion Granting Amended Motion to Approve Joinder and Denying Motion to Dismiss is worth repeating:

> While this Court recognizes the importance of deterring bad faith conduct in bankruptcy proceedings, the Court found at the Hearing that § 303(c) unambiguously provides for joinder, "[a]fter the filing of a petition . . . but before the case is dismissed or relief is ordered," if the joining creditor holds "an unsecured claim that is not contingent" and is not an initial petitioning creditor. 11 U.S.C. § 303(c). "The plain language of section 303(c) simply does not condition joinder on the good faith of the original petitioning creditors." *In re FKF Madison Park Grp. Owner, LLC*, 435 B.R. at 908; *see In re Houston Reg'l Sports Network, L.P.*, 505 B.R. at 477 (finding that "later-joining creditors are not tainted by the alleged bad faith of the original petitioners"). Accordingly, this Court finds that it lacks the authority to "arbitrarily impose non-statutory conditions to joinder" and declines to adopt the judicially created bar-to-joinder doctrine. *In re FKF Madison Park Grp. Owner, LLC*, 435 B.R. at 908; *see also Fetner*, 99 F.3d at 1181 ("[T]here is a panoply of weapons in a court's arsenal to deal with bad faith petitioners without depriving valid creditors of their statutory right to join the bankruptcy petition.") (citing *In re Kidwell*, 158 B.R. at 216-19).

(Dkt. 52 at 8). The Parties agree that the Stipulated Claims meet the plain language requirements of § 303(b). Neither § 303(b) nor § 303(c) contains independent knowledge requirements that joining creditors must know as of the petition date that an alleged debtor generally was not paying its debts as they came due. *See In re Kennedy*, 504 B.R. 815 (Bankr. S.D. Miss. 2014) (finding that a dismissal for bad faith is inappropriate when the petitioning creditors meet the prerequisite requirements under § 303). As a result, this Court once again follows the Supreme Court of the

United States' holding in *Law v. Siegel*, 571 U.S. 415 (2014), noting that "it is not for courts to alter the balance struck by the statute." *Id.* at 427 (citing *Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376-77 (1990)); *see In re Ex-L Tube, Inc.*, No. 06-42967-7, 2007 WL 541670, at *3 (Bankr. W.D. Mo. Feb. 16, 2007) (noting that the dismissal of an involuntary petition where the filing requirements have been met "would seemingly be in direct contravention to the unambiguous language of" the Code); *see also In re Basil St. Partners, LLC*, 477 B.R. 846, 855 (Bankr. M.D. Fla. 2012) ("If the law allowed a petition to be dismissed, or a finding of bad faith to be rendered, even where petitioning creditors held qualifying claims and had otherwise properly commenced an involuntary case, then no involuntary petition would ever be filed."). Accordingly, the Court finds that the Petitioning Creditors holding the Stipulated Claims satisfy the requirements set forth in § 303(b).[10]

## B.     Section 303(h): Was the Alleged Debtor generally paying its debts as they came due and are the debts subject to a bona fide dispute as to liability or amount?

Section 303(h) provides that "after trial, the court shall order relief against the debtor . . . only if . . . the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." 11 U.S.C. § 303(h). The determination of whether an alleged debtor generally is paying its debts as they come due "must be made as of the date the involuntary petition is filed." *In re Kennedy*, 504 B.R. at 822; *see In re Sims*, 994 F.2d at 222. Courts analyze four factors in determining whether an alleged debtor generally is not paying its debts as they come due: "(1) the number of unpaid claims; (2) the amount of such claims; (3) the materiality of the non-payments; and (4) the [alleged] debtor's

---

[10] The Court notes that many of the Evidentiary Objections concern the Petitioning Creditors' counter-designations to the deposition excerpts of the Petitioning Creditors holding the Stipulated Claims. The Court will rule on these objections *infra* in a manner consistent with this analysis.

overall conduct in [its] financial affairs." *In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000). This analysis "is not a balance-sheet insolvency test based on a comparison of assets and liabilities." *In re Green Hills Dev. Co.*, 445 B.R. 647, 657 (Bankr. S.D. Miss. 2011), *aff'd*, 741 F.3d 651 (5th Cir. 2014). Instead, rather, "[i]t is a factual [analysis] . . . [that] 'requires consideration of both the amount of the debts not being paid and the number of creditors not being paid.'" *In re Kennedy*, 504 B.R. at 822 (quoting *In re Green Hills Dev. Co.*, 445 B.R. at 657)). Courts may determine that an alleged debtor "is not generally paying [its] debts 'when [it] is not paying one hundred percent of [its] debts to only one creditor, or [when it is] paying most of [its] debts in number to small recurring creditors, but is not paying a few creditors that make up the bulk of [its] debts.'" *In re Kennedy*, 504 B.R. at 822 (quoting *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009)). Importantly, "[t]here is no single mathematical formula that can be used to determine whether the standard has . . . been met. The diversity exhibited by those suffering financial distress calls for a broad definition rather than a mechanical test." *In re Green Hills Dev. Co.*, 445 B.R. at 657 (citation and quotation omitted). The Petitioning Creditors must show by a preponderance of the evidence that the Alleged Debtor generally was not paying its debts as they became due as of the date of the filing of the Petition. *Id.* Importantly, the analysis of whether the Alleged Debtor generally is paying its debts as they come due is not limited to the debts the Alleged Debtor owes to the Petitioning Creditors. *See generally* 2 Collier on Bankruptcy ¶ 303.31.

      With respect to the first two factors, the number of unpaid claims and the amount of such claims, the Petitioning Creditors assert that the Alleged Debtor "had 353 creditors and debts totaling more than $42 million dollars" as of the Petition Date. (Dkt. 157 at 25). Indeed, the third amended creditor matrix (the "Creditor Matrix") (Dkt. 130) filed by the Alleged Debtor on March

4, 2019, evidences that the Alleged Debtor had 353 creditors as of the Petition Date.  (Stipulated Ex. 114).  A further examination of the Creditor Matrix suggests that, on the Petition Date, the Alleged Debtor had twenty-eight (28) disputed claims[11] and 325 undisputed claims.  (*Id.*)  Five (5) of the 325 undisputed claims reflect debts owed to secured lenders in the amount of $33,206,686.00.  (*Id.*)  As to the materiality of the Alleged Debtor's non-payments, the Creditor Matrix suggests that the Alleged Debtor's unpaid debts mostly are comprised of costs for "maintenance and repairs," "supplies," "utilities," "uniforms," and "employees," which are related directly to the continuation of the Alleged Debtor's business.  (Dkt. 130).

The final factor requires the Court to consider the Alleged Debtor's overall conduct in its financial affairs.  On April 12, 2018, Mansfield and the Alleged Debtor entered into the Strategic Alliance and Acquisition Option Agreement (the "SAA") (Stipulated Ex. 3).  At or near the time Mansfield and the Alleged Debtor entered into the SAA, the Alleged Debtor notified Mansfield that its senior lender, PNC Financial Services Group, Inc. ("PNC Bank"), would not consent to the SAA unless there was an agreement in place for PNC Bank's loan to be paid off.  (Dkt. 156 at 8; Dkt. 157 at 4).  Ultimately, Mansfield agreed to pay the Alleged Debtor four (4) weekly payments of $1,200,000.00, or $4,800,000.00 collectively, so that PNC Bank would consent to the SAA.  (Dkt. 156 at 9; Dkt. 157 at 4; Stipulated Ex. 5).  The Alleged Debtor and Mansfield dispute whether the Alleged Debtor definitively repaid this debt.  Regardless, however, the events surrounding the enactment of the SAA suggest that the Alleged Debtor needed outside assistance to repay its larger debts.

---

[11] Currently, the Creditor Matrix reflects twenty-seven (27) disputed claims.  The employee claim for Clark Webb initially was disputed by the Alleged Debtor on the Petition Date but subsequently was paid on November 2, 2018.  (Stipulated Ex. 114 at 5).

Additionally, the Alleged Debtor never made "payments of principal or interest on its largest long-term debts owed to Capital South and Harbert." (Dkt. 143 at 32; Dkt. 157 at 15). As a result, "[t]he debts to these creditors accrued interest at eighteen percent (18%) which was deferred as 'PIK' (payment in kind) interest." (Dkt. 143 at 32). At Trial, McGlinn testified that the Alleged Debtor was not paying and could not pay the debts owed to Capitala and Harbert.[12] On October 22, 2018, the Alleged Debtor had $111,885.00 in cash, and McGlinn indicated in a meeting with Mansfield "that the [Alleged Debtor's] stakeholders were unwilling to infuse any more cash into [the Alleged Debtor]." (Dkt. 143 at 31). The next day, the Alleged Debtor notified its customers that it was unable to continue its operations. (*Id.*) On the Petition Date, the Alleged Debtor had $98,881.00 in cash (Stipulated Ex. 39) and owed principal and PIK interest of $17,762,095.00 to Capital South ("Capitala") and $12,269,050.00 to Harbert, which comprises approximately seventy percent (70%) of the Alleged Debtor's total debt. (Stipulated Ex. 37; Dkt. 130).

With respect to Capitala and Harbert, the Alleged Debtor asserted at Trial that it "had no past due payment on its largest outstanding obligations" because "the relevant debt agreements permitted [the Alleged Debtor] to make interest payments to [Capitala and Harbert] by issuing additional debt . . . in lieu of cash payments." (Dkt. 156 at 48). The Petitioning Creditors, however, argued that Capitala's and Harbert's willingness to defer payment of their debts is irrelevant in determining whether the Alleged Debtor generally was paying its debts as they came due. (Dkt. 157 at 26). In support of this assertion, the Petitioning Creditors cite *In re All Media Properties, Inc.*, 5 B.R. 126, 147-48 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981), for the following finding:

---

[12] Test. of McGlinn at 2:43:20 – 2:44:10 (Mar. 11, 2019).

> Even though Mr. Wigginton testified that he and his affiliated companies were willing to postpone payments, the court has a problem in believing that this means that All Media has been paying its debts as they became due. Since Mr. Wigginton is an insider to All Media and his other companies (which are also creditors of All Media), for him to say that he and his affiliates are willing to have payments deferred and that therefore All Media is generally paying its due debt means that the other creditors who have not been paid must bear the additional risk that All Media's position might further deteriorate. The court believes that the other creditors who are not insiders are entitled to the relief provided under the Code. The fact that a debtor is not paying "insiders" who happen to be creditors, and that those "insiders" are not pressing for payment does not negate the fact that the debtor was not paying its debts as they became due. The purpose of an involuntary . . . proceeding is to protect all creditors from the loss occasioned by a company failing completely. This purpose cannot be accomplished if a debtor, by arranging to postpone payments to "insider" creditors, is then said to be generally paying his debts as they become due.

*In re All Media Props., Inc.*, 5 B.R. at 147-48. The Court finds the bankruptcy court's reasoning in *In re All Media Props., Inc.* persuasive because "[t]he scenario the *All Media* court was concerned about manifested itself in this case." (Dkt. 157 at 27).

The Alleged Debtor ceased operations on October 23, 2018, and it had 325 undisputed claims on the Petition Date. (Dkt. 130). On October 31, 2018, the day after the filing of the Petition, the Alleged Debtor sold its operating assets in a "fire sale"[13] to Diesel Direct, Inc., for a cash payment of $1,000,000.00, the assumption of debt in the amount of $3,100,000.00, and contingent earn-out payments in the future. (Dkt. 156 at 22; Dkt. 157 at 14). While the Alleged Debtor argues that "the majority of [its debts] were current on the Involuntary Petition Date according to industry standards and the relevant courses of dealing" and that "only $16,678.00 was more than 91 days outstanding" on the Petition Date, the Creditor Matrix reflects that the Alleged Debtor made payments on undisputed claims only after the Alleged Debtor sold its operating assets in the "fire sale." (Dkt. 130). Indeed, the Alleged Debtor asserted at Trial that it "used the proceeds

---

[13] Test. of McGlinn at 2:15:30 – 2:15:40 (Mar. 11, 2019).

from the sale to Diesel Direct to pay off its vehicle financing on assets sold and to pay wages and accrued time off owed to over 100 employees." (Dkt. 156 at 22). Thus, the Alleged Debtor had no ability on the Petition Date to pay its undisputed debts unless it ceased operations, sold its assets, and used the sale proceeds to pay some of its debts. This is precisely what the Alleged Debtor did the day after the Petition Date, October 31, 2018, and it still has outstanding debts. (Dkt. 130). Accordingly, the Court finds that the Petitioning Creditors have established that the Alleged Debtor generally was not paying its debts as they came due.

Since the Petitioning Creditors have satisfied their burden of proving that the Alleged Debtor generally is not paying its debts as they become due, the Court now turns to whether the Petitioning Creditors have established that the Stipulated Claims are not subject to a bona fide dispute as to liability or amount. This Court already has determined that no bona fide dispute exists as to the Stipulated Claims for purposes of standing under § 303(b)(2). The determination under § 303(h), however, requires a different analysis. "Section 303(b) 'merely requires that the *claim* not be subject to a bona fide dispute as to liability or amount, whereas [§ 303(h)(1)] addresses whether the *debt* is subject to a bona fide dispute as to liability or amount.'" *In re Green Hills Dev. Co.*, 445 B.R. at 661 (quoting 2 BANKRUPTCY LITIGATION § 11:10, at 3 (2011)) (emphasis added); *see also Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005, 1008-09 n.7 (9th Cir. 1998) (discussing the possibility that a counterclaim may not be subject to a "bona fide dispute" under § 303(b) but may be subject to a "bona fide dispute" under § 303(h) because § 303(b) refers to "a claim against such person that is not . . . the subject of a bona fide dispute" where § 303(h) allows the alleged debtor "to avoid an involuntary filing when [its] 'debts . . . are the subject of a bona fide dispute'") (citations omitted). In other words, "a counterclaim will not defeat a creditor's *standing* to bring an involuntary petition," but a counterclaim becomes

relevant for purposes of § 303(h) if, for instance, an otherwise solvent alleged debtor has withheld payment from a creditor because the creditor owes the alleged debtor money on an unrelated claim. *See In re Seko Inv., Inc.*, 156 F.3d at 1009.

Here, the Alleged Debtor asserts that the Stipulated Claims, "whose claims would not otherwise be disputed as to validity and/or amount," should be disqualified under § 303(h) based upon the same "legal theory" it advanced for purposes of § 303(b). (Dkt. 143 at 33). In response, the Petitioning Creditors again argue "that a counterclaim under Section 303(i) of the Bankruptcy Code is a post-judgment remedy only and does not create a dispute for purposes of either Section 303(b) [or] (h) of the Bankruptcy Code to an otherwise undisputed claim." (*Id.*) For the reasons discussed *supra*, and since the Court declines to dismiss the Petition, the Court finds that the Stipulated Claims are not subject to offset by the Counterclaim under §303(i) and, therefore, are not subject to a bona fide dispute as to liability or amount under § 303(h). Accordingly, the Court finds that the Petitioning Creditors have satisfied the required elements under § 303(h).

## C.     Bad Faith

Section 303(b) governs the standing requirements of petitioning creditors filing involuntary petitions against alleged debtors. "Good faith is not an explicit requirement for granting involuntary relief under § 303." *In re Kennedy*, 504 B.R. at 823; *see* 2 COLLIER ON BANKRUPTCY ¶ 303.16 (Section 303 "does not require that an involuntary petition be filed in good faith[.]"). Indeed, "bad faith" is mentioned only in § 303(i), which "contemplates bad faith only as a requirement for the recovery of punitive damages *after* the involuntary petition is dismissed." *In re Kennedy*, 504 B.R. at 823-24; *see also In re Kidwell*, 158 B.R. 203, 217 (Bankr. E.D. Cal. 1993) (Section 303(i) "makes plain that bad faith is not relevant unless consequential and punitive damages are under consideration."). If the petitioning creditors satisfy "the prerequisite

requirements under § 303, 'a finding of bad faith [is] inappropriate.'" *In re Kennedy*, 504 B.R. at 824 (quoting *Aigner v. McMillan*, No. 11-47029-DML-7, 2013 WL 2445042, at *4 (Bankr. N.D. Tex. June 4, 2013)).

Nevertheless, as the Alleged Debtor explained at Trial, some courts have found that "bad faith provides an independent basis for dismissing an involuntary petition." *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 330 (3d Cir. 2015). This Court addressed previously the judicially created bad-faith exception to § 303(c) in the Opinion Granting Amended Motion to Approve Joinder and Denying Motion to Dismiss. In the Amended Motion to Dismiss denied by the Court, the Alleged Debtor argued that the Court should dismiss the Involuntary Proceeding because Mansfield filed the Petition in bad faith. Additionally, the Alleged Debtor urged the Court to adopt the bar-to-joinder doctrine so that if the Court were to find that Mansfield filed the Petition in bad faith, the creditors seeking to join the Petition would be unable to cure the defective Petition. In response, Mansfield argued that § 303 provides for joinder as "a matter of right" and that even if the Court found that it filed the Petition in bad faith, such a finding would not prevent other creditors from joining the Petition. Ultimately, this Court declined to adopt the judicially created bar-to-joinder doctrine because § 303(c) unambiguously provides for joinder and it lacks the authority to arbitrarily impose non-statutory conditions to joinder. (Dkt. 52 at 5-8). For similar reasons, the Court finds that the Alleged Debtor's argument at Trial that the Court should dismiss the Petition for bad faith even if the Petitioning Creditors satisfy the requirements under § 303 is without merit because this Court lacks the authority to arbitrarily impose non-statutory requirements to the procedure for filing involuntary petitions as set forth in the Code. *See Law v. Siegel*, 571 U.S. 415, 427 (2014).

At Trial, the Alleged Debtor presented extensive evidence in an attempt to support its assertion that Mansfield filed the Petition in bad faith.  For example, the Alleged Debtor argued that: (1) Mansfield's claim against the Alleged Debtor was subject to a bona fide dispute on the Petition Date; (2) Mansfield knew that the Alleged Debtor had more than twelve (12) creditors; (3) Mansfield breached the SAA in October 2018 when it stopped making payments in the ordinary course of business, which caused the Alleged Debtor eventually to cease its operations; (4) Mansfield solicited the Alleged Debtor's customers and employees immediately after it ceased its operations; (5) Mansfield sent copies of the Petition on the Petition Date to third parties interested in purchasing the Alleged Debtor's assets; and (6) Mansfield filed the Petition as the sole petitioning creditor and then began soliciting other creditors to join in the Petition by providing them with a "form joinder to sign and a joint prosecution agreement."  (Dkt. 156 at 14-15, 19, 21, 25, 33).

Next, the Alleged Debtor asserted at Trial that the Petitioning Creditors filed or joined in the Petition in bad faith because they entered into joint prosecution agreements.  (Dkt. 156 at 38-39).  More specifically, the Alleged Debtor argues that "[t]he Joint Prosecution Agreements provide for Mansfield to bear all costs, including legal counsel fees, for prosecuting the Involuntary Petition."  (Dkt. 156 at 39).  Further, "the Joint Prosecution Agreements each provide for Mansfield to indemnify the respective Joining Creditor for any claims resulting from the Involuntary Petition."  (*Id.*)   The Alleged Debtor argues that these joint prosecution agreements are improper because "Mansfield and the Joining Creditors, through the Joint Prosecution Agreements, attempt to strip the Joining Creditors of any risk under Section 303(i) and thereby insulate them from their own bad faith."  (Dkt. 156 at 40).  In response, Mansfield asserts that its general counsel proposed joint prosecution agreements to joining creditors for two reasons.  First,

Mansfield already had decided to file the Petition and to bear the costs of prosecuting the Involuntary Proceeding on its own before learning that additional creditors existed. Second, "it became immediately clear to Mansfield that [the Alleged Debtor]'s opposition to the Involuntary Petition would be largely about the On-Site/Mansfield relationship and not about the other Petitioning Creditors." (Dkt. 157 at 40). Since the Motion to Dismiss suggested that Mansfield filed the Petition in bad faith, Mansfield maintains that it "did not believe it fair to ask other creditors to assume any risk or liability for something that did not concern them." (*Id.* at 40-41). Mansfield notes that it "did not receive any assignments nor assume responsibility for any matters pertaining to the individual claims of the other Petitioning Creditors or defense of the same." (*Id.* at 41).

Finally, the Alleged Debtor argued at Trial that the joining creditors, or the Petitioning Creditors excluding Mansfield, joined in the Petition in bad faith because they did not have independent knowledge, as of the Petition Date, of the Alleged Debtor's financial situation or that the Alleged Debtor generally was not paying its debts as they came due. (Dkt. 156 at 41). In other words, the Alleged Debtor reasserts its "legal theory," discussed *supra*, as a basis for the Court to dismiss the Petition.

Despite this Court's ruling before the Trial declining to adopt the bar-to-joinder doctrine, the Court gave the Alleged Debtor every opportunity to convince the Court at Trial that its bad faith argument is something other than a repackaged and relabeled version of the bar-to-joinder doctrine. After considering the pleadings, evidence, and testimony presented at Trial, the Court remains unconvinced. Because this Court declined previously to adopt the bar-to-joinder doctrine, several of the Alleged Debtor's creditors joined in the Petition. Petitioning creditors may seek out other creditors to join in involuntary petitions. *In re Braten*, 74 B.R. 1021, 1022 (Bankr. S.D.N.Y.

1987).   The solicitation of creditors does not give rise to a finding of bad faith "unless the solicitation consisted of false statements, itself amounted to fraud, or the intervening creditors felt undue pressure to join the petition."  *In re Key Auto Liquidation Ctr., Inc.*, 372 B.R. 74, 80 (Bankr. N.D. Fla. 2007).   After fully examining the record, the Court finds that the Alleged Debtor produced no evidence of false statements, fraudulent conduct, or undue pressure exhibited by Mansfield in soliciting other creditors to join in the Petition.  (Dkt. 156 at 38-42; Dkt. 157 at 40-42).  As mentioned earlier, the Parties agree that nine (9) of the Petitioning Creditors, not including Mansfield, hold claims against the Alleged Debtor that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount and that, in the aggregate, exceed the value of any liens by $15,775.00.  Additionally, this Court already has declined to adopt the Alleged Debtor's "legal theory" and has found that the Petitioning Creditors have met their burden in showing that the Alleged Debtor generally was not paying its debts as they came due on the Petition Date and that those debts are not subject to a bona fide dispute as to liability or amount. Accordingly, the Court finds that the determination of whether Mansfield filed the Petition in bad faith is irrelevant because the Petitioning Creditors holding the Stipulated Claims cure any defect that may exist in the Petition.

## D.   Counterclaim

The Alleged Debtor asserts the Counterclaim under § 303(i) against the Petitioning Creditors for costs and attorney's fees and against Mansfield for actual and punitive damages "for knowingly and improperly filing the Involuntary Petition under the penalty of perjury in bad faith." (Dkt. 48 at 4).  As discussed *supra*, the Counterclaim is contingent upon this Court dismissing the Petition.  Since the Court is not dismissing the Petition, the Court finds that the Counterclaim should be denied as moot.

## E.    Evidentiary Objections

In the Evidentiary Objections, the Alleged Debtor "objects to the counter-designations of deposition excerpts filed by the Petitioning Creditors." (Dkt. 149). The Petitioning Creditors offer counter-designations to the Alleged Debtor's designations under Rule 32(a)(6) of the Federal Rules of Civil Procedure ("Rule 32(a)(6)"), as made applicable to the Involuntary Proceeding by Rules 1018 and 7032 of the Federal Rules of Bankruptcy Procedure. The Alleged Debtor objects to the Petitioning Creditors' counter-designations to the deposition excerpts of joining creditors that designate additional testimony and/or exhibits that differ from the Alleged Debtor's designations as an impermissible use of a party's own deposition testimony under Rule 32(a) that fails to meet the standards under Rule 32(a)(6). Additionally, the Alleged Debtor objects to the Petitioning Creditors' counter-designations to the deposition excerpts of joining creditors that appear to be identical to the Alleged Debtor's designations, claiming that they only "may . . . be submitted into evidence by stipulation of the Petitioning Creditors as to those portions designated by the Alleged Debtor." (Dkt. 149 at 7). Finally, the Alleged Debtor asserts the following objections to the Petitioning Creditors' counter-designations to the deposition excerpts of Prentiss: duplicative; relevancy; leading; assumes facts not in evidence; incomplete; confusing; illegible; and hearsay.

After reviewing the Petitioning Creditors' counter-designations and the Alleged Debtor's objections, the Court finds that it does not need to rule upon the Alleged Debtor's objections to the Petitioning Creditors' counter-designations to the deposition excerpts of the joining creditors because it has rejected the Alleged Debtor's "legal theory" and has determined that all evidence supporting such theory is irrelevant. With respect to the Alleged Debtor's objections to the Petitioning Creditors' counter-designations to the deposition excerpts of Prentiss, the Court notes

as a preliminary matter that in bench trials, such as this one, "[s]trict evidentiary rules of admissibility are generally relaxed . . . as appellate courts assume that trial judges rely upon properly admitted and relevant evidence." *Null v. Wainwright*, 508 F.2d 340, 344 (5th Cir. 1975).

The Court finds that the Alleged Debtor and the Petitioning Creditors stipulated at the beginning of Prentiss's deposition to "object to form only and reserve all other [objections] for later."[14]  As a result, objections as to the form of a question were waived if not preserved.  "The purpose of the so-called 'usual stipulations' is to force an objection to the form of a question where the issue can be corrected during the deposition." *Perez v. Bruister*, Civil Action No. 3:13cv1001-DPJ-FKB, 2014 WL 3779640 (S.D. Miss. July 31, 2014).  Thus, the Court finds that the Alleged Debtor's objections to leading questions where the Alleged Debtor did not object to the form of those questions at Prentiss's deposition should be overruled pursuant to the stipulation at the outset of Prentiss's deposition and Rule 30 of the Federal Rules of Civil Procedure ("Rule 30"), as made applicable to the Involuntary Proceeding by Rules 1018 and 7030 of the Federal Rules of Bankruptcy Procedure.

The Court further finds that the Alleged Debtor's objections to leading questions where the Alleged Debtor did object to the form of those questions at Prentiss's deposition should be overruled based upon the Court's discretion. *United States v. Templeman*, 965 F.2d 617, 619 (8th Cir. 1992) ("Rulings on objections to leading questions are entrusted to the discretion of the trial court.").  The Court also finds that the Alleged Debtor's duplicative and relevancy objections should be overruled.  *Null*, 508 F.2d at 344.  As to the Alleged Debtor's objections to assuming facts not in evidence, incompleteness, and confusion, the Court finds that these objections should be overruled but also finds that the Alleged Debtor's request for further designations of testimony

---

[14] Prentiss Dep. 11:1-11:6.

pursuant to Rule 32(a)(6) should be granted to cure any prejudice resulting from the admission of the counter-designations by the Petitioning Creditors. Finally, with respect to the Alleged Debtor's Exhibits 27, 30, and 33, the Court sustains the objection to Exhibit 27 for illegibility and overrules the hearsay objections to Exhibits 30 and 33. *See Lentz v. Cahaba Disaster Relief, LLC (In re CDP Corp.)*, 462 B.R. 615, 636-37 (Bankr. S.D. Miss. 2011).

## Conclusion

For the above and foregoing reasons, the Court finds that the Petitioning Creditors have established that they have standing to file the Petition under § 303(b) and have met their burden in showing that the Alleged Debtor generally was not paying its debts as they came due on the Petition Date and that those debts are not subject to a bona fide dispute as to liability or amount under § 303(h). Accordingly, the Court finds that an order for relief on the Petition should be entered. With respect to the Counterclaim, the Court finds that it should be denied as moot. Finally, the Court has resolved the Evidentiary Objections in the manner described above. To the extent the Court has not addressed any of the parties' other arguments or positions, it has considered them and determined they would not alter the result.

IT IS, THEREFORE, ORDERED that an order for relief under chapter 7 shall be entered in the Involuntary Proceeding.

IT IS FURTHER ORDERED that the Counterclaim is hereby denied as moot.

IT IS FURTHER ORDERED that the Alleged Debtor's objections to leading questions where the Alleged Debtor did not object to the form of the question at Prentiss's deposition are hereby overruled.

IT IS FURTHER ORDERED that the Alleged Debtor's objections to leading questions where the Alleged Debtor did object to the form of the question at Prentiss's deposition are hereby overruled.

IT IS FURTHER ORDERED that the Alleged Debtor's duplicative and relevancy objections are hereby overruled.

IT IS FURTHER ORDERED that the Alleged Debtor's objections to assuming facts not in evidence, incompleteness, and confusion are hereby overruled, and the Alleged Debtor's request for further designations is hereby granted.

IT IS FURTHER ORDERED that the Alleged Debtor's objection to Exhibit 27 of Prentiss's deposition for illegibility is hereby sustained.

IT IS FURTHER ORDERED that the Alleged Debtor's hearsay objections to Exhibits 30 and 33 of Prentiss's deposition are hereby overruled.

##END OF OPINION##