

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: May 8, 2020**

**The Order of the Court is set forth below. The docket reflects the date entered.**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

**IN RE:**

**ON-SITE FUEL SERVICE, INC.,**                          **CASE NO. 18-04196-NPO**

**DEBTOR.**                                              **CHAPTER 7**

### MEMORANDUM OPINION AND ORDER DENYING
### CAPITALSOUTH PARTNERS SBIC FUND III, LLP MOTION
### FOR DERIVATIVE STANDING TO ASSERT ESTATE CLAIMS
### <u>AGAINST MANSFIELD OIL COMPANY OF GAINESVILLE, INC.</u>

This matter came before the Court for a telephonic hearing on April 16, 2020 (the "Hearing"), on CapitalSouth Partners SBIC Fund III, LLP Motion for Derivative Standing to Assert Estate Claims Against Mansfield Oil Company of Gainesville, Inc. (the "Derivative Standing Motion") (Bankr. Dkt. 320)[1] filed by Capital South Partners SBIC Fund III, LP (the "Collateral Agent"); Trustee Eileen N. Shaffer's Response to Motion by CapitalSouth Partners SBIC Fund III, LP for Derivative Standing to Assert Estate Claims Against Mansfield Oil

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-referenced bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. __)"; (2) citations to docket entries in *Mansfield Oil Company of Gainesville, Inc. v. Capitala Finance Corp., et al.*, Adv. Proc. 19-00059-NPO (the "Mansfield Adversary") are cited as "(M. Adv. Dkt. __)"; and (3) citations to docket entries in *Shaffer v. Diesel Direct, Inc. et al.*, Adv. Proc. 20-00007-NPO (the "Trustee Adversary") are cited as "(Tr. Adv. Dkt. __)" even though the docket in the Trustee Adversary is the same as the docket in the Mansfield Adversary after the date of the consolidation of these adversary proceedings on March 4, 2020.  (Tr. Adv. Dkt. 28; M. Adv. Dkt. 105).

Company of Gainesville, Inc. (the "Trustee's Response") (Bankr. Dkt. 326) filed by Eileen N. Shaffer, the chapter 7 trustee (the "Trustee") for the bankruptcy estate of On-Site Fuel Service, Inc. ("On-Site"); and the Response of Mansfield Oil Company of Gainesville, Inc. to Motion for Derivative Standing to Assert Estate Claims (the "Mansfield's Response") (Bankr. Dkt. 327) filed by Mansfield Oil Company of Gainesville, Inc. ("Mansfield") in the Bankruptcy Case.

The Collateral Agent attached the following two (2) exhibits to the Derivative Standing Motion: (1) the Strategic Alliance and Acquisition Option Agreement and Agreement for Sale of Petroleum Products (the "SAA") (Bankr. Dkt. 320-1) and (2) the Diesel Direct Asset Purchase Agreement (Without Schedules) (Bankr. Dkt. 320-2). At the Hearing, James A. Wright, III, Jeffrey R. Blackwood, Anthony P. La Rocco, and J. Walter Newman, IV represented the Collateral Agent, Capitala Finance Corp., and Capital South Partners Fund II, LP (collectively, "Capitala"); W. Thomas McCraney, III and Douglas C. Noble represented Mansfield; William Liston, III, W. Lawrence Deas, and Donald A. Phillips represented the Trustee; Craig M. Geno represented Diesel Direct, Inc.; and E. Barney Robinson, III represented Harbert Mezzanine Partners III, LP, f/k/a Harbert Mezzanine Partners III SBIC, LP ("Harbert"). At the Hearing, the Court denied the Derivative Standing Motion from the bench. This Opinion memorializes and supplements the Court's bench ruling.

## JURISDICTION

The Court has jurisdiction over the parties to and the subject matter of this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (F), and (O). Notice of the Hearing was proper under the circumstances.

## FACTUAL ALLEGATIONS[2]

In the Derivative Standing Motion, the Collateral Agent seeks authorization to assert claims allegedly held by On-Site's bankruptcy estate against Mansfield.  Although counsel for the Collateral Agent stated at the Hearing that the Collateral Agent intended to pursue these claims in a third-party complaint filed in the Mansfield Adversary, no copy of the proposed third-party complaint is attached to the Derivative Standing Motion.[3]  To provide context to the procedural history, therefore, the Court relies on the facts set forth in the Memorandum Opinion and Order on Involuntary Petition Against a Non-Individual; On-Site Fuel Service, Inc.'s Answer to Involuntary Petition for Bankruptcy and Counterclaim under 11 U.S.C. § 303(i); Answer and Affirmative Defenses of Petitioning Creditors to Counterclaim under 11 U.S.C. § 303(i); and Objections to Counter-Designations of Deposition Excerpts Filed by Petitioning Creditors as to Certain Joining Creditors and Jared Prentiss [Dkt. Nos. 132-140] (Bankr. Dkt. 159); *see In re On-Site Fuel Serv., Inc.*, Case No. 18-04196-NPO, 2019 WL 2252003 (Bankr. S.D. Miss. May 24, 2019).

**Background**

Capitala and Harbert are private equity firms and together are the majority owners of On-Site, a tank wagon fuel supply business.  Mansfield is a nationwide supplier of petroleum products.  On April 12, 2018, Mansfield and On-Site entered into the SAA whereby Mansfield would sell petroleum products directly to On-Site's customers, and On-Site would focus on the delivery side

---

[2] For a more thorough examination of the underlying allegations, background, and procedural history, see the Memorandum Opinion and Order on: (1) Harbert and Harrison's Rules 9(b), 12(b)(7) & 12(c) Motion for Judgment on the Pleadings and (2) Capitala Defendants' Motion to Dismiss First Amended Complaint (M. Adv. Dkt. 169).

[3] For clarity, no bankruptcy rule required that the Collateral Agent attach a copy of the proposed third-party complaint to the Derivative Standing Motion, but a creditor seeking derivative standing generally will do so because it assists a court in determining the scope and viability of the claims it seeks permission to pursue on behalf of the estate.

of its business. *In re On-Site Fuel*, 2019 WL 2252003, at *7. At or near that time, On-Site notified Mansfield that its senior lender, PNC Financial Services Group, Inc. ("PNC Bank"), would not consent to the SAA unless there was an agreement in place for On-Site to pay off PNC Bank's loan. Ultimately, Mansfield agreed to advance On-Site four (4) weekly payments of $1.2 million, or $4.8 million collectively, so that PNC Bank would consent to the SAA. *Id.* On-Site and Mansfield dispute whether On-Site repaid this debt. On October 22, 2018, John McGlinn ("McGlinn"), Capitala's chief operating officer and chairman of On-Site's board of directors, indicated in a meeting with Mansfield that On-Site's "stakeholders," Capitala and Harbert, were unwilling to infuse any more cash into On-Site. The next day, October 23, 2018, On-Site ceased operations and on October 31, 2018, sold its operating assets in a "fire sale" to Diesel Direct, Inc. *Id.* at *8.

## PROCEDURAL HISTORY

**Bankruptcy Case**

On October 30, 2018, Mansfield filed a chapter 7 involuntary petition (the "Involuntary Petition") (Bankr. Dkt. 1) against On-Site. The Involuntary Petition was contested and litigated for several months concluding in a three-day trial in March with closing arguments on April 3, 2019. On May 24, 2019, the Court entered the Order for Relief, and Stephen Smith was appointed the chapter 7 trustee in the Bankruptcy Case. (Bankr. Dkt. 159). He resigned on September 13, 2019, and that same day, the current Trustee was appointed. (Bankr. Dkt. 255, 256).

In the Bankruptcy Case, Capitala and Harbert filed proofs of claim 49, 50, 51 and 54 (Claim #49-51, 54) for a total debt of $17,044,999.85 in principal, plus accrued interest and fees for "Money loaned." Capitala and Harbert purportedly are the largest creditors of the estate and allegedly hold a perfected security interest in substantially all assets of the estate. Mansfield filed

proof of claim 53 (Claim #53) for an unsecured debt of $8,748,767.51 for "Fuel sold, breach of contract, conversion."

**Adversary Proceedings**

There are two pending adversary proceedings related to the Bankruptcy Case, the Mansfield Adversary and the Trustee Adversary.  Because of the issues raised in the Derivative Standing Motion, the Court provides a brief summary of the facts alleged in each one.

**Mansfield Adversary**

In the Mansfield Adversary, commenced on August 20, 2019,[4] the First Amended Complaint (the "Mansfield Complaint") (M. Adv. Dkt. 77) names as defendants Capitala, McGlinn, Harbert, and John C. Harrison ("Harrison"), a senior managing director of Harbert who also served as a member of On-Site's board of directors.  In the Mansfield Complaint, Mansfield requests entry of a judgment against Capitala, McGlinn, Harbert, and Harrison, jointly and severally, for compensatory and punitive damages under common-law claims of fraud, negligent misrepresentation, tortious interference with contract, aiding and abetting, and civil conspiracy. (M. Adv. Dkt. 77 ¶¶ 62-84).  Mansfield also seeks treble damages under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1.  (M. Adv. Dkt. 77 ¶¶ 85-90).

In support of its claims, Mansfield alleges that Capitala and Harbert managed their investment in On-Site as a joint venture by controlling On-Site's board of directors.  (M. Adv. Dkt. 77 ¶¶ 15-16).  McGlinn was Capitala's primary board representative, and Harrison was Harbert's primary board representative.  (M. Adv. Dkt. 77 ¶ 18).  Mansfield contends that McGlinn and

---

[4] The Mansfield Adversary was filed on August 20, 2019 as a civil action in the U.S. District Court for the Southern District of Mississippi in Cause No. 3:19-CV-00587-CWR-FKB.

Harrison voted as one block to control the operations, finances, and strategic decisions of On-Site for the benefit of Capitala and Harbert. (M. Adv. Dkt. 77 ¶ 19).

In 2017, as agents for Capitala and Harbert, McGlinn and Harrison formed a two (2)-member "Special Committee" of On-Site's board of directors supposedly for the purpose of pursuing strategic options for On-Site and specifically a business relationship with Mansfield. (M. Adv. Dkt. 77 ¶ 20). While purportedly acting on behalf of On-Site, Capitala, Harbert, McGlinn, and Harrison allegedly persuaded Mansfield to sign the SAA and become a strategic partner with On-Site. (M. Adv. Dkt. 77 ¶ 22). Mansfield contends that during the pre-SAA discussions, McGlinn provided financial information about On-Site that he knew or should have known was materially inaccurate. For example, McGlinn represented to Mansfield that On-Site was generating "Earnings Before Interest, Taxes, Depreciation and Amortization" ("EBITDA") averaging approximately $300,000.00 per month. (M. Adv. Dkt. 77 ¶ 22).

The SAA signed by On-Site and Mansfield contemplated that Mansfield would become On-Site's exclusive fuel supplier. (M. Adv. Dkt. 77-1, Ex. 1). On-Site would continue delivering fuel to its customers, and Mansfield would pay the transportation fees. Mansfield would take over invoicing and credit management for On-Site's customers except for three (3) direct-bill customers that would remit their payments to a "lock box" account controlled by Mansfield. (M. Adv. Dkt. 77 ¶ 28). The SAA granted the parties "the right at all times to set-off sums that it owes to the other party against sums owed to it by the other party." (M. Adv. Dkt. 77 ¶ 29; M. Adv. Dkt. 77-1, Ex. 1 ¶ 30). The SAA also provided that Mansfield could suspend regular payments to On-Site if On-Site failed to satisfy any payment obligation owed to Mansfield within 10 days of the due date. (M. Adv. Dkt. 77 ¶ 29; M. Adv. Dkt. 77-1, Ex. 1 ¶ 2).

As part of the SAA, Mansfield purchased the exclusive option to acquire On-Site's tank wagon business for a pre-negotiated purchase price of $23 million in exchange for an "Acquisition Option Fee" of $1 million. The option expired in four (4) years, and during this time, the SAA prohibited On-Site, Capitala, and Harbert from selling or soliciting a sale of On-Site's assets without Mansfield's consent.  (M. Adv. Dkt. 77 ¶ 30, M. Adv. Dkt. 77-1, Ex. 1 ¶¶ 17, 21).

When PNC Bank refused to consent to the contemplated arrangement without an agreement in place for On-Site to pay off its indebtedness, McGlinn, acting on behalf of On-Site and its majority owners, allegedly solicited Mansfield to provide $4.8 million in financial assistance to pay off On-Site's loan with PNC Bank.  (M. Adv. Dkt. 77 ¶¶ 31-32).  Mansfield asserts that to induce it to make this payment, McGlinn represented that On-Site had specific assets of approximately $6 million with which On-Site would repay the debt.  Mansfield alleges that McGlinn assured it that these assets were valid, collectable, unencumbered, and specifically designed  to "settle the account" with Mansfield within 120 days (the "Earmarked Assets").[5]  (M. Adv. Dkt. 77 ¶ 32).  According to Mansfield, McGlinn's representations were false and deceptive, because McGlinn knew or should have known that On-Site was undercapitalized and insolvent and that On-Site had neither the ability nor the intention of repaying its debt to Mansfield.

Mansfield alleges that it relied on McGlinn's representations in agreeing to assist On-Site by entering into a Tri-Party Agreement (the "TPA") with On-Site and PNC Bank on May 12, 2018. (M. Adv. Dkt. 77 ¶ 35; M. Adv. Dkt. 77-3, Ex. 3).  The TPA required On-Site to use the cash payments of $4.8 million from Mansfield to pay-off PNC Bank within 60 days.

---

[5] Mansfield refers to these assets as Earmarked Assets although no document uses that term.

Once the TPA was signed, On-Site's customers, except for the direct-bill customers, transitioned to Mansfield, and the SAA "went live" as of May 13, 2018. (M. Adv. Dkt. 77 ¶ 36). There was a delay until August 22, 2018 in setting up the "lock box" account for the direct-bill customers. In the meantime, On-Site continued to receive payments from the direct-bill customers for deliveries of Mansfield's fuel. Mansfield alleges that On-Site had a duty to remit these payments to Mansfield along with accurate remittance instructions but instead, On-Site began misappropriating payments from the direct-bill customers and using these payments as an interest-free source of capital to fund its operations.

On June 15, 2018, McGlinn sent an email to John Byrd ("Byrd"), Mansfield's chief financial officer, confirming that On-Site owed Mansfield the net amount of approximately $4.7 million. (M. Adv. Dkt. 77 ¶ 39; M. Adv. Dkt. 77-5, Ex. 5). Mansfield contends that in that email, McGlinn also assured Byrd that On-Site still had Earmarked Assets of approximately $7 million with which to repay its debt to Mansfield. (M. Adv. Dkt. 77 ¶ 39; M. Adv. Dkt. 77-5, Ex. 5). Mansfield alleges that these representations by McGlinn were false and deceptive.

During this time, On-Site provided "wind down" and "burn down" reports to update Mansfield as to the net amount owed. (M. Adv. Dkt. 77 ¶ 45). Mansfield alleges that in these reports and in contemporaneous discussions, McGlinn continued to represent falsely to Mansfield that On-Site had Earmarked Assets to repay the debt within the 120-day period. (M. Adv. Dkt. 77 ¶ 45).

Mansfield contends that On-Site defaulted on its obligation to pay-off the debt on September 15, 2018. (M. Adv. Dkt. 77 ¶ 47). Mansfield further contends that after the default, On-Site disclosed downward adjustments that had been made to reflect negative EBITDA performance for the 2017 and 2018 years but that had not been disclosed previously to Mansfield.

According to Mansfield, when representatives of On-Site and Mansfield met on October 4, 2018, to discuss On-Site's debt and restated financial reports, On-Site presented an "Executive Touchpoint" slide presentation that revealed that On-Site had experienced a seven percent (7%) drop in fuel sales volume beginning in late 2017.  (M. Adv. Dkt. 77 ¶¶ 45, 49).

Following the October 4, 2018 meeting, representatives of On-Site and Mansfield had ongoing discussions about reconciling the direct-bill customer transactions and possible work-out scenarios to preserve the relationship.  (M. Adv. Dkt. 77 ¶ 52).  McGlinn provided Mansfield with a copy of an internal report that analyzed On-Site's financial condition through August 31, 2018. (M. Adv. Dkt. 77 ¶ 53).  The report allegedly contained additional, previously undisclosed information about On-Site's financial condition.  (M. Adv. Dkt. 77 ¶ 54).  Mansfield contends that it included a disturbing "observation" that for the past twenty (20) months, On-Site had not generated "sufficient cash flow to (i) service its truck and equipment loans, (ii) pay cash interest, (iii) fund capital expenditures, and (iv) absorb non-operating expenses."  (M. Adv. Dkt. 77 ¶ 54). According to Mansfield, the report also showed that On-Site had negative "free cash flow" of $7.9 million during the past twenty (20) months and had negative cash flow from operations for the period from January through August 2018 of $1.4 million.  (M. Adv. Dkt. 77 ¶ 54).  On October 11, 2018, Mansfield purportedly suspended further payments to On-Site to prevent On-Site's debt from continuing to grow.

Representatives of Mansfield and On-Site met again on October 19 and 22, 2018.  (M. Adv. Dkt. 77 ¶ 55-56).  During the October 22, 2018 meeting, McGlinn informed Mansfield that Capitala and Harbert were unwilling to infuse any additional cash to fund On-Site's operations. Mansfield alleges that McGlinn, acting on behalf of Capitala, Harbert, and Harrison, proposed that Mansfield continue to fund On-Site's operations while deferring any repayment of On-Site's debt

indefinitely.  Mansfield further alleges that in follow-up discussions with Byrd, McGlinn revealed that instead of using the Earmarked Assets to repay Mansfield as previously represented, these resources were used to fund On-Site's operations.

On October 23, 2018, On-Site emailed a letter to customers stating it would not remain in business and terminated all of its employees except for a "skeleton crew."  (M. Adv. Dkt. 77 ¶ 57). As of that date, On-Site no longer had any viable business.  On October 31, 2018, On-Site closed a "fire sale" of its assets to Diesel Direct, Inc. at a price that Mansfield alleges was below fair market value.  (M. Adv. Dkt. 77 ¶ 60).

**Trustee Adversary**

In the Trustee Adversary, commenced on February 3, 2020, the First Amended Complaint (Tr. Adv. Dkt. 27) names as defendants Diesel Direct, Inc., Capitala, and Harbert.  The Trustee seeks to subordinate the secured claims purportedly held by Capitala and Harbert against the bankruptcy estate and to avoid the "fire sale" of On-Site's assets to Diesel Direct, Inc.  (Tr. Adv. Dkt. 27 at 24-25).  In support of the equitable subordination claims, the Trustee alleges that Capitala and Harbert exercised control over On-Site's assets and business decisions through their appointment of four members of On-Site's five-member board of directors.  (Tr. Adv. Dkt. 27 ¶ 25(a)).  McGlinn, a senior managing director and chief operating officer of Capitala, was Capitala's primary representative on On-Site's board of directors, serving as its chairman. McGlinn acted as the primary agent for the Capitala-Harbert joint venture.  (Tr. Adv. Dkt. 27 ¶ 26). Harrison, a senior managing director of Harbert, also served as a member of On-Site's board of directors.  (Tr. Adv. Dkt. 27 ¶ 27).  The Trustee's allegations mirror closely the allegations in the Mansfield Complaint.

The Trustee describes Mansfield as a nationwide supplier of petroleum products with which On-Site did business prior to April 2018 when On-Site became Mansfield's strategic alliance "partner." (Tr. Adv. Dkt. 27 ¶ 28). Prior to the strategic alliance, On-Site obtained fuel for delivery to its customers by "pulling" fuel from Mansfield's inventories at fuel supply terminals, and Mansfield, from time to time, hired On-Site to deliver fuel to Mansfield's customers. (Tr. Adv. Dkt. 27 ¶ 29). Such business interactions created a transactional pattern of charges from Mansfield to On-Site for the cost of fuel, and charges from On-Site to Mansfield for fuel delivery fees, which gave rise to a fluctuating balance of accounts receivable/accounts payable between the two companies.

In 2017, McGlinn and Harrison formed a two-member "Special Committee" supposedly for the purpose of pursuing strategic options for On-Site, and, in particular, a strategic alliance with Mansfield. (Tr. Adv. Dkt. 27 ¶ 30). The strategic alliance allegedly contemplated a business relationship in which Mansfield would be the exclusive supplier of fuel to On-Site and assume the responsibility of billing On-Site's customers, thereby allowing On-Site to focus on its core business of fuel delivery.

The Trustee alleges that during discussions with Mansfield concerning the strategic alliance, On-Site disclosed its 2017 financial statements to Mansfield that reflected positive EBITDA of approximately $300,00.00 per month. (Tr. Adv. Dkt. 27 ¶ 31). Later, on December 9, 2017, McGlinn, or others under his direction, allegedly prepared On-Site's 2018 budget forecast and transmitted it to Mansfield. According to the Trustee, the 2018 budget projected positive EBITDA of approximately $4.3 million. The Trustee asserts that McGlinn and Harrison intended that Mansfield rely on these financial representations, and that the positive EBITDA was a primary factor that motivated Mansfield to enter into the strategic alliance. The Trustee contends that

during their communications with Mansfield, McGlinn and Harrison had information available to them about On-Site's true financial information and that the information provided to Mansfield was materially inaccurate. (Tr. Adv. Dkt. 27 ¶ 32).

Before the effective date of the strategic alliance, McGlinn informed Mansfield that On-Site's primary lender, PNC Bank, would not agree to the strategic alliance without paying off On-Site's debt to PNC Bank. (Tr. Adv. Dkt. 27 ¶ 35). By allegedly representing to Mansfield that On-Site anticipated receipt of $6 million in collectable cash inflows in the near term, McGlinn secured Mansfield's agreement to contribute $4.8 million towards paying off the debt to PNC Bank. (Tr. Adv. Dkt. 27 ¶ 35; Tr. Adv. Dkt. 27-3, Ex. 3). The Trustee asserts that McGlinn either knew this representation was false or was ignorant of its truth, but clearly, McGlinn's misrepresentation to Mansfield was intended to benefit the Capitala-Harbert joint venture by allowing it to avoid the infusion of additional investment into On-Site, a company that the Trustee asserts that McGlinn and the Capitala-Harbert joint venture knew was financially unstable.

According to the Trustee, the pertinent portions of the SAA, which became effective on May 12, 2018, are as follows:

      a.     Mansfield shall supply fuel for delivery to On-Site's customers, and with the exception of certain "lock box" customers of On-Site, Mansfield shall invoice On-Site's customers for fuel costs and delivery fees, remitting the delivery fees to On-Site;

      b.     On-Site shall have a ten-day time period to make payment to Mansfield, and Mansfield may suspend its performance under the SAA until On-Site pays all outstanding Mansfield invoices;

      c.     In a period of time "not to exceed 120 days," On-Site shall pay Mansfield the "Outstanding Accounts Receivable Balance Owed to Mansfield," including the $4.8 million that Mansfield contributed to pay off the debt to PNC Bank;

      d.     At all times, each party to the SAA had the right of set-off with regard to any sums owed to the other; and

e.     Mansfield had the option to acquire On-Site's tank wagon business for a purchase price of $23 million, which amount included a non-refundable option fee of $1 million.  On-Site and its stockholders, Capitala and Harbert, agreed that during the term of the option, they would not solicit or entertain acquisition offers from any entity other than Mansfield.

(Tr. Adv. Dkt. 27 ¶ 37; Tr. Adv. Dkt. 27-3, Ex. 3).

The Trustee alleges that through early September 2018, McGlinn and On-Site's executive officers continued to assure Mansfield of On-Site's financial stability and ability to perform, even though they were cognizant of On-Site's rapidly deteriorating financial condition.  (Tr. Adv. Dkt. 27 ¶ 38; Tr. Adv. Dkt. 27-4 to 27-8, Exs. 4-8).  According to the Trustee, On-Site failed to pay its debt to Mansfield by September 15, 2018, thereby breaching the SAA.  (Tr. Adv. Dkt. 27 ¶ 41). In an October 4, 2018 meeting with Mansfield, the Trustee asserts that McGlinn and On-Site's executives presented information reflecting a financial performance that sharply deviated from On-Site's prior representations to Mansfield, including a significant decrease in On-Site's business volume and a $1.4 million loss from operations through August 2018.  (Tr. Adv. Dkt. 27 ¶ 42). The Trustee contends that as of October 4, 2018, On-Site owed Mansfield approximately $5,892,161.00 with no ability or means to repay Mansfield.  (Tr. Adv. Dkt. 27 ¶ 42). On-Site provided an internal report to Mansfield on October 8, 2018, that concluded for the twenty months ending on August 31, 2018, "[On-Site was] not generating sufficient cash flow to service its truck and equipment loans, pay cash interest, fund capital expenditures, and absorb non-operating expenses."  (Tr. Adv. Dkt. 27 ¶ 43; Tr. Adv. Dkt. 27-9, Ex. 9).  The Trustee alleges that upon receipt of this information, Mansfield exercised its contractual right of set-off and ceased payments to On-Site.  (Tr. Adv. Dkt. 27 ¶ 44).

According to the Trustee, McGlinn abandoned his fiduciary duty to act in the best interests of On-Site by closing On-Site on October 22, 2018 and disposing of On-Site's assets in a manner

that minimized their value and that placed the interests of Capitala and Harbert over the interests of On-Site's other creditors, including Mansfield.  (Tr. Adv. Dkt. 27 ¶ 47).  The Trustee alleges that McGlinn breached his duties of care, loyalty, and fair dealing by:

> a.      Transmitting an email on October 22, 2018 informing all customers that On-Site would no longer service their fuel needs, thus causing a *de facto* dissolution of On-Site's business;
>
> b.      Instructing On-Site to terminate all but a skeleton crew of On-Site's employees;
>
> c.      Negotiating with Diesel Direct, Inc. on October 23, 2018 about a sale of substantially all of On-Site's assets in violation of the SAA;
>
> d.      Disseminating to "Interested Parties" an October 25, 2018 letter that offered immediately to sell substantially all of On-Site's business assets valued at $7 million to make it appear that McGlinn was seeking competitive bids when On-Site's then attorney already had begun drafting an asset purchase agreement with Diesel Direct, Inc.; and
>
> e.      Causing on October 31, 2018 the "fire sale" of On-Site assets valued at $7,619,335.00 to Diesel Direct, Inc. requiring Diesel Direct, Inc. to pay $1 million in cash, assume $3.1 million of debt encumbering the operating assets, and pay a future royalty of 5% to 10% of gross profits generated by Diesel Direct, Inc.'s servicing of On-Site's customers.

(Tr. Adv. Dkt. 27 ¶ 48; Tr. Adv. Dkt. 27-1, Ex. 1; Tr. Adv. Dkt. 27-10, Ex. 10).

McGlinn, Capitala, and Harbert then structured the asset purchase agreement so that the consideration paid by Diesel Direct, Inc. could be routed directly to the Capitala-Harbert joint venture and bypass On-Site.  (Tr. Adv. Dkt. 27 ¶ 50).  In summary, the Trustee alleges that McGlinn and Harrison, acting at the behest of Capitala and Harbert, directly participated in inequitable conduct that harmed On-Site and was intended to hinder, harm, or defraud Mansfield or other creditors by:

> a.      Misrepresenting On-Site's financial condition to Mansfield for the purpose of soliciting Mansfield's entry into a strategic alliance agreement wherein Mansfield sustained substantial losses;

b.      Misrepresenting to Mansfield that On-Site anticipated receipt of $6 million to $7 million of cash-inflows in the near term with which to repay Mansfield for its contribution of $4.8 million to the payoff of PNC Bank;

c.      Retaining and/or diverting "lock box" payments and/or other amounts received by On-Site rather than paying the same to Mansfield as required by the terms of the strategic alliance agreement;

d.      Unilaterally instituting, without the necessary board and/or shareholder approval, a *de facto* dissolution of On-Site's business by notifying On-Site's customers that their fuel needs would no longer be serviced;

e.      Soliciting and entertaining offers to purchase On-Site's tank wagon fuel business assets from parties other than Mansfield, in violation of the SAA;

f.      Breaching the duties of care, loyalty and fair dealing owed to On-Site, and failing to protect and preserve the value of On-Site's property by entering into the asset purchase agreement that transferred and sold On-Site's assets to Diesel Direct, Inc. for grossly inadequate consideration;

g.      Favoring Capitala and Harbert to the detriment of other creditors by contracting with Diesel Direct, Inc. for the right to assign all of On-Site's rights under the asset purchase agreement, including the right to all consideration paid by Diesel Direct, Inc. to Capitala and Harbert as third-party beneficiaries; and

h.      Favoring certain creditors over others, by issuing post-petition payments to selected creditors which held secured liens superior to the liens held by Capitala and Harbert on the transferred assets.

(Tr. Adv. Dkt. 27 ¶ 58).  As relief, the  Trustee asks the Court to subordinate the bankruptcy claims of Capitala and Harbert against On-Site to the level of equity.

**Consolidation of Mansfield Adversary and Trustee Adversary**

Because the Trustee's Adversary shares common questions of fact and law, the Court ordered the consolidation of the Trustee's Adversary with the Mansfield Adversary for discovery and trial purposes pursuant to Rule 42 of the Federal Rules of Civil Procedure ("Rule 42").[6]  (Tr. Adv. Dkt. 28; M. Adv. Dkt. 105).

---

[6] Rule 42 is made applicable to adversary proceedings by Rule 7042 of the Federal Rules of Bankruptcy Procedure.

**Derivative Standing Motion**

In the Derivative Standing Motion, the Collateral Agent seeks authorization to assert claims allegedly held by On-Site's bankruptcy estate against Mansfield for breaches of the SAA, torts arising out of Mansfield's "wrongful acts . . . giving rise to the Estate's contract claims," and claims under chapter 5 of the Bankruptcy Code, "including preference claims." (Bankr. Dkt. 320 at 1). The Collateral Agent proposes to pursue these claims in a third-party complaint filed in the Mansfield Adversary.

With respect to the contract claims, the Collateral Agent alleges that Mansfield breached the SAA by: (1) failing to drive new customer volume to On-Site; (2) impairing On-Site's recovery of "pre-SAA" accounts receivable because of invoicing errors; (3) ceasing all payments to On-Site in October 2018; and (4) soliciting On-Site's customers. (Bankr. Dkt. 320 at 1-2). The Collateral Agent further alleges that On-Site may have tort claims "for, among other things, breach of fiduciary duty, tortious breach of contract, conversion, and tortious interference" but does not disclose their legal or factual basis. (Bankr. Dkt. 320 at 2). At the Hearing, counsel for the Collateral Agent described the breach of fiduciary duty as arising out of Mansfield's control over On-Site as part of the strategic alliance. (Hr'g at 10:30:20-10:32:28) (Apr. 16, 2020).[7] Also at the Hearing, the Collateral Agent withdrew its request for derivative standing to pursue preference claims against Mansfield. (Hr'g at 10:10:10-10:11:00).

In the Trustee's Response (Bankr. Dkt. 326), the Trustee states that "the proposition of bringing the contract claims" against Mansfield was discussed with the Collateral Agent but that the Trustee "verbally refused" because such claims lacked merit. (Bankr. Dkt. 326 at 2). The

---

[7] Because the Hearing was not transcribed, references are to the timestamp of the audio recording.

Trustee asserts that no provision in the SAA expressly or impliedly imposed an obligation on Mansfield to provide On-Site with new or additional customer volume and that a merger clause in the SAA would prevent the introduction of evidence of any pre-contractual discussions about customer volume pursuant to the parol evidence rule.  The Trustee questions whether the SAA imposed any obligation on Mansfield to invoice for fuel deliveries that occurred before the effective date of the SAA, but even assuming it did, the Trustee contends that the SAA apparently limited Mansfield's obligations to those customers that received petroleum products supplied by Mansfield.  As to the cessation of payments to On-Site in October 2018, the Trustee views the Collateral Agent's allegation as overlooking the factors unrelated to Mansfield that caused or substantially contributed to On-Site's insolvency.  Moreover, the Trustee cites to McGlinn's previous testimony that Mansfield acted within its contractual rights under the SAA in suspending payments.  (Bankr. Dkt. 326 at 6).  Finally, with respect to Mansfield's alleged solicitation of On-Site's customers, the Trustee rejects the Collateral Agent's assumption that On-Site's customers would have been serviced by Diesel Direct, Inc. in the absence of the alleged breach.  The Trustee contends that On-Site's "going out of business" letter dated October 23, 2018 resulted in On-Site's customers scrambling in search of an alternative fuel supply source.  The Trustee finds it problematic that any loss of earn-out revenue by On-Site arose from On-Site's own breach of the SAA by selling its assets without Mansfield's consent.  Also, the Trustee interprets the asset purchase agreement as contracting away On-Site's exclusive right to receive earn-out payments by routing any earn-out payments directly to Capitala and Harbert.  Moreover, the Trustee maintains that proof of lost future profits is afflicted with speculation and conjecture.  The Trustee suggests that the Collateral Agent wants to prosecute claims against Mansfield, "not for the purpose of recovering provable damages to the Estate, but to allow the Collateral Agent to leverage

such claims against those filed by Mansfield against the Capitala and Harbert defendants in Adversary Proceeding No. 19-00059." (Bankr. Dkt. 326 at 11).

The Trustee does not state any position on the purported tort claims in the Trustee's Response because the Collateral Agent did not disclose their factual or legal basis. Because the Trustee continues to investigate chapter 5 claims, including those that may exist against Mansfield, the Trustee opposes standing as to any preference claims. In summary, the Trustee does not oppose the standing of the Collateral Agent, "[s]ubject to approval of the Court," to pursue some of the contract claims "however unlikely the chance of success." (Bankr. Dkt. 326 at 14). The Trustee opposes the standing of the Collateral Agent to assert any tort or preference claims. After hearing the Collateral Agent's clarification at the Hearing that the potential tort claims arose out of the contract claims, the Trustee did not argue against the Collateral Agent's standing to pursue any such tort claims against Mansfield as long as any recovery by the Collateral Agent would inure to the benefit of the estate and any litigation expenses would be borne initially by the Collateral Agent.

## DISCUSSION[8]

There is no explicit authority in the Bankruptcy Code that allows a bankruptcy court to grant an individual creditor or a creditors' committee standing to initiate adversary proceedings in the name of the debtor or trustee. The Fifth Circuit Court of Appeals and a majority of other Circuit Courts have held that such statutory authority nonetheless is implied. *See La. World Exposition, Inc. v. Fed. Ins. Co. (In re La. World Exposition, Inc.)*, 858 F.2d 233 (5th Cir. 1988) (noting that "the circumstances under which a creditors' committee may sue are not explicitly

---

[8] The following findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

spelled out in the Code"); *see also Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.)*, 330 F.3d 548 (3d Cir. 2003); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Grp., Inc.)*, 66 F.3d 1436, 1440-41 (6th Cir. 1995); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *PW Enters. v. N.D. Racing Comm'n (In re Racing Servs., Inc.)*, 540 F.3d 892 (8th Cir. 2008); *Avalanche Mar., Ltd. v. Parekh (In re Parmetex, Inc.)*, 199 F.3d 1029, 1031 (9th Cir. 1999). The seminal case in this jurisdiction is *Louisiana World*, which involved the chapter 11 case of a nonprofit corporation that had organized the New Orleans's World's Fair of 1984. *Louisiana World*, 858 F.2d at 235. The estate had potential causes of action against the debtor's officers and directors for gross negligence, mismanagement, and breach of fiduciary duty. The creditors' committee demanded that the debtor bring an action, but the debtor's board of directors refused to vote on the demand, recognizing that it had an inherent conflict of interest. Construing that response as a refusal to sue, the creditors' committee obtained permission from the bankruptcy court to file an action on the debtor's behalf and then brought suit in federal district court where it faced a motion to dismiss for lack of standing. The district court granted the motion to dismiss.

On appeal, the Fifth Circuit noted that the proposed causes of action against the officers and directors were property of the bankruptcy estate and that the debtor was duty bound to assert them if doing so would maximize the value of the estate but that because of a conflict of interest, the debtor refused to sue on the corporation's behalf. The Fifth Circuit found it well settled in other jurisdictions that a creditors' committee has standing in some circumstances to file suit on behalf of a debtor. *Louisiana World*, 858 F.2d at 247. It agreed with those jurisdictions that the statutory basis for granting a creditor's committee derivative standing to pursue estate causes of

action is implied in 11 U.S.C. §§ 1103(c)(5) and 1109(b). The Fifth Circuit also found an additional non-statutory rationale for granting a creditor's committee derivative standing in a chapter 11 case when a debtor, like a "fox guarding the hen house," has a conflict of interest in pursuing an action because of its relationship with management. Recognizing that such circumstances existed in the matter before it, the Fifth Circuit articulated three considerations relevant in making that determination, including: (1) whether the claim is colorable; (2) whether the debtor in possession or the trustee unjustifiably refused to pursue the claim; and (3) whether the creditors' committee first received leave to sue from the bankruptcy court. *Louisiana World*, 858 F.2d at 247. These requirements ensure that derivative standing does not risk interfering with the debtor or trustee and prevents creditors from pursuing weak claims. Since *Louisiana World*, the Fifth Circuit also has recognized the availability of derivative standing in chapter 7 cases. *See Lilly v. Fed. Deposit Ins. Corp. (In re Natchez Corp. of W. Va.)*, 953 F.2d 184, 187 (5th Cir. 1992).

## A.     Absence of Unequivocal Consent to Derivative Standing

Notwithstanding the factors articulated by the Fifth Circuit in *Louisiana World*, the Collateral Agent argues that because the Trustee has agreed to allow it to bring the estate's contract and tort claims against Mansfield, the standard has shifted so that it need only show that the proposed suit: (a) is in the best interests of the bankruptcy estate and (b) is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. For this proposition, the Collateral Agent cites the Eighth Circuit Court of Appeal's decision in *In re Racing Services, Inc.*, 540 F.3d at 902 (citing *Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 100 (2d Cir. 2001)). There, the Eighth Circuit developed a different standard in cases where the trustee consents to representation by a creditor or creditors' committee.

In consent to derivative standing cases, according to the Eighth Circuit, the question of whether the trustee has unjustifiably refused to initiate suit is replaced by the question whether the claims are "colorable."  If the claims are not "colorable" because they lack merit, then allowing an individual creditor or a creditors' committee to pursue them would not be in the best interests of the bankruptcy estate or necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.  The Collateral Agent does not cite any Fifth Circuit case or other authority within this jurisdiction that has adopted the Eighth Circuit's standard for derivative standing in consent cases.  Given the role of a chapter 7 trustee as an independent fiduciary, however, the application of a different standard in consent to standing cases in the chapter 7 context makes sense.  The Court finds, however, that the statements in the Trustee's Response and those by the Trustee's counsel at the Hearing do not constitute the type of consent to standing that would justify a departure from the standard set forth by the Fifth Circuit in *Louisiana World*.

In the Trustee's Response, for example, the Trustee refers to the Collateral Agent's proposed contract claims as "half-baked" and describes the Derivative Standing Motion as lacking the "substance necessary to the Trustee's evaluation of tort and/or Chapter 5 claims."  (Bankr. Dkt. 326 at 11, 13).  Under the partial heading "Limited Consent," the Trustee reiterates the position that the contract claims proposed by the Collateral Agent are not likely to succeed but then states that the Trustee cannot "take the position that such claims should not be filed or prosecuted by the Collateral Agent" because if, "by some infinitesimal chance," the Collateral Agent does succeed, any recovery would inure to the benefit of the estate and any litigation expenses initially would be borne by the Collateral Agent.  For this reason only, the Trustee "consents" to the prosecution of the contract claims by the Collateral Agent "[s]ubject to approval of the Court."  The Trustee

opposes granting the Collateral Agent standing to pursue either the tort or chapter 5 claims against Mansfield.

These statements in the Trustee's Response demonstrate at most an intention by the Trustee to abandon these causes of action on the ground they lack merit.  The Trustee's agreement to derivative standing is described in the Trustee's Response as "limited," and the Court finds ambiguous the Trustee's legal position in the Trustee's Response.  In ten pages of the Trustee's Response, the Trustee provides a careful and thorough analysis of the proposed contract claims and explains in detail why they would not survive a motion to dismiss and, consequently, why the decision not to pursue them is justified.  (Bankr. Dkt. 326 at 2-12).  In two pages of the Trustee's Response, however, the Trustee grants "limited" consent to standing "[s]ubject to approval of the Court."  (Bankr. Dkt. 326 at 14-15).

The Trustee's equivocation on the issue of consent to standing continued at the Hearing. Counsel for the Trustee again stated that the contract and tort claims lacked merit but then appeared to agree to allow the Collateral Agent to pursue both contract and tort claims against Mansfield. The Court rejects the Collateral Agent's characterization of the Trustee's evolving legal position as the type of "consent" to standing that led the Eighth Circuit to develop a different standard. Derivative standing by agreement would require coordination of litigation responsibilities between the Trustee and the Collateral Agent, which neither side has suggested has occurred here and which is unlikely to occur under these facts where the Trustee is asserting an equitable subordination claim against the Collateral Agent.  For this reason, the Court's denial of the Derivative Standing Motion is consistent with the bankruptcy court's decision in *Reed v. Cooper (In re Cooper)*, 405 B.R. 801 (Bankr. N.D. Tex. 2009).

In *In re Cooper*, the bankruptcy court applied the Fifth Circuit's holding in *Louisiana World* to determine whether to grant derivative standing to a creditor in a chapter 7 case. *Id.* at 804. The bankruptcy court considered whether the chapter 7 trustee had a "colorable claim" and, yet, was "'unable or unwilling to fulfill its obligations'—the classic example being because of a conflict of interest." *Id.* (citing *Louisiana World*, 858 F.2d at 252.).

In its analysis, the *Cooper* court distinguished between derivative standing in the chapter 11 context as opposed to the chapter 7 context. Because in a chapter 7 case, unlike in a chapter 11 case, a trustee is always in place, the bankruptcy court concluded that the analysis for determining creditor derivative standing in a chapter 7 case differs from that in a chapter 11 case. As an independent fiduciary, a chapter 7 trustee is required to exercise reasonable business judgment in deciding what actions to bring on behalf of the estate. The chapter 7 trustee eliminates the potential conflicts of interest that a debtor sometimes has in pursuing a cause of action, as was the situation in *Louisiana World*. The ordinary remedy for a creditor when the chapter 7 trustee is not pursuing a cause of action that it believes would benefit the estate is to file a motion to compel the trustee to act or to file a motion to have the trustee removed. 11 U.S.C. § 324. As the bankruptcy court in *Cooper* explained:

> If creditors do not like the job the trustee is doing, they can file a motion to compel him or her to act, or a motion for removal of the trustee (11 U.S.C. § 324). In the context of such a motion, the court can scrutinize the business judgment and litigation zeal (or lack thereof) that is being exercised by the trustee. But simply allowing a creditor—a non-statutory fiduciary—to go forward in the Chapter 7 trustee's stead could facilitate a creditor "hijacking" a Chapter 7 bankruptcy case in a manner that Congress did not envision.

*In re Cooper*, 405 B.R. at 812. In summary, the bankruptcy court in *In re Cooper* cautioned that "it seems to be a generally unwise idea, to this court, to allow a creditor to usurp the trustee's role

as a representative of the estate (including being a gatekeeper for what actions make sense, weighing the potential benefits of litigation.)" *Id.* at 813.

The Court recognizes that a chapter 7 trustee is the gatekeeper for deciding which actions to pursue on behalf of an estate and finds the bankruptcy court's analysis in *Cooper* of derivative standing in chapter 7 cases to be persuasive. By denying the Derivative Standing Motion notwithstanding the Trustee's so-called "consent" to standing, however, the Court is not usurping the role of the Trustee as the gatekeeper given that the Trustee's representations to the Court, although evolving, never strayed from the legal position that the claims lack "color" and should not be pursued. Regardless, even if consent to standing exists, the Collateral Agent has the burden of proving to the Court the presence of colorable claims against Mansfield, a requirement under either the Fifth Circuit's standard in *Louisiana World* or the Eighth Circuit's standard for consent cases in *Racing Services* and a matter that the Court turns to next.

## B. No "Colorable" Claim

A creditor or a creditors' committee seeking derivative standing must assert a "colorable" claim, defined as a claim that would survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").[9] The U.S. Supreme Court has held that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matters, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Fifth Circuit has noted that "[w]here the

---

[9] Rule 12(b)(6) is made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure.

complaint is devoid of facts that would put the defendant on notice as to what conduct supports the claims, the complaint fails to satisfy the requirement of notice pleading." *Anderson v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 525, 528 (5th Cir. 2008).

Because no proposed third-party complaint is attached to the Derivate Standing Motion,[10] the Court's analysis in determining whether the Collateral Agent states any "colorable" claim for relief is limited. The Collateral Agent states in the Derivative Standing Motion that the estate "has contract claims against Mansfield for breach of the SAA," "*may* have tort claims against Mansfield," and "*may* also have claims . . . under Section 547." (Bankr. Dkt. 320 at 1-2) (emphasis added). The Derivative Standing Motion only loosely outlines the proposed contract claims and barely mentions the tort and preference claims.

At the Hearing, the Collateral Agent withdrew its request for derivative standing to pursue claims under chapter 5 of the Bankruptcy Code and for the first time attempted to identify its tort claim for breach of fiduciary duty. Counsel for the Collateral Agent also attempted to respond to some of the Trustee's challenges to the proposed contract claims against Mansfield. The Collateral Agent acknowledged that it would be difficult to prove On-Site's damages for loss of earn-out revenue and that the parol evidence rule might impact its claim related to customer volume but nevertheless argued that these claims were colorable. The Collateral Agent maintained that the SAA prohibits Mansfield from soliciting On-Site's customers for a period of time after its termination and that Mansfield breached its obligations under the SAA before the "fire" sale. Finally, the Collateral Agent argued that the invoicing issues at least contributed to On-Site's liquidity problems.

---

[10] *See supra* note 3.

The Court finds that the Collateral Agent has not met its burden to demonstrate that specific, colorable claims exist. The contract claims, as described in the Derivative Standing Motion, appear to lack merit and viability and, therefore, are unlikely to survive a Rule 12(b)(6) motion to dismiss for the reasons set forth by the Trustee in the Trustee's Response. The Court finds inadequate the Collateral Agent's attempt at the Hearing to rebut those reasons by acknowledging some of the problems pointed out by the Trustee, ignoring others, and suggesting that Mansfield may have had contractual obligations to On-Site not mentioned in the SAA. The tort claims are not described in the Derivative Standing Motion, and at the Hearing, the Collateral Agent discussed only the tort claim for breach of fiduciary duty. The Collateral Agent, however, did not explain how the SAA gave rise to a fiduciary relationship under state law and did not identify which facts supported a finding that Mansfield breached any such fiduciary duty.

## C.      Conflicts of Interest

An alternative but no less important reason for denying the Derivative Standing Motion are the conflicts of interest that would arise if the Collateral Agent and its present attorneys were allowed to pursue claims on behalf of the Trustee in the Mansfield Adversary or any other adversary proceeding while simultaneously defending the equitable subordination claims in the Trustee Adversary. As counsel for Mansfield stated at the Hearing, ignoring the conflicts of interest issue is like ignoring a "herd of elephants in the room." (Hr'g at 10:46:37-10:46:58). Yet the Collateral Agent does just that in the Derivative Standing Motion and at the Hearing.

The Trustee determined which factual narrative is more credible, Mansfield's or the Collateral Agent's, and the Trustee chose Mansfield's factual narrative. The nucleus of operative facts that would support the contract and tort claims the Collateral Agent proposes to assert in the Mansfield Adversary and those that the Trustee has asserted in support of the equitable

subordination claims in the Trustee Adversary, which mirror the allegations in the Mansfield Adversary, are in complete opposition. Allowing the Collateral Agent to pursue the contract and tort claims against Mansfield would pit the estate against itself.

For example, the Collateral Agent alleges that Mansfield breached the SAA when it ceased making payments to On-Site in October 2018, but the Trustee alleges in the Trustee Adversary that "Mansfield exercised its contractual right of set-off" when it ceased making these payments. (Tr. Adv. Dkt. 27 ¶ 44). The Trustee Adversary is filled with allegations of wrongful conduct by the Collateral Agent, including that the Collateral Agent acted improperly and inequitably with respect to the estate and Mansfield. It would create an absurd result to allow the Collateral Agent, acting on behalf of the estate, to compel the estate to adopt a factual narrative to prosecute claims against Mansfield for its alleged wrongful conduct, while at the same time, in the same consolidated trial, and with the same group of attorneys to allow the Collateral Agent to defend claims by the Trustee based on an entirely different factual narrative. As Mansfield recognizes, it would place the Collateral Agent "on both sides of the v." in the adversary proceedings. (Bankr. Dkt. 327 ¶ 14). Moreover, if the Collateral Agent successfully pursues the proposed claims on behalf of the estate, it would defeat the Trustee's equitable subordination claims in the Trustee Adversary against the Collateral Agent, which potentially are the source of the largest recovery for the estate. Eliminating that source does not further the best interests of the estate. (Bankr. Dkt. 327).

The problem with granting the Collateral Agent derivative standing is illustrated by issues of attorney-client privilege that may arise if the Collateral Agent were allowed to pursue claims on behalf of the estate. *See* FED. R. EVID. 501 (setting forth general principles regarding the applicability of federal and state law of privileges). In *Commodity Futures Trading Comm'n v.*

*Weintraub*, 471 U.S. 343, 358 (1986), the U.S. Supreme Court held that in corporate bankruptcy cases, the chapter 7 trustee acquires the debtor's attorney-client privilege because "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349.  The U.S. Supreme Court reasoned that because outside bankruptcy, the attorney-client privilege is controlled by management of a corporation, the actor whose duties most closely resemble those of management should control the privilege in bankruptcy *Id*. at 351-52.  Thus, if the Collateral Agent obtained authorization to sue on behalf of the estate, the Collateral Agent might gain control over the exercise of the Trustee's attorney-client privilege as it relates to those claims.  The Collateral Agent and its attorney then would have access to On-Site's privileged communications and documents in the Mansfield Adversary when that same information would be under the control of the Trustee and, thus, likely protected from disclosure to the Collateral Agent and its attorneys in the Trustee Adversary.

The Court finds that just as a conflict of interest between a corporate debtor and its management may justify granting a creditor derivative standing, a conflict of interest between a trustee and the creditor seeking derivative standing may justify its denial.  In *Louisiana World*, the Fifth Circuit noted that the general requirements for derivative standing—that the claim be colorable, that the debtor have refused unjustifiably to pursue the claim, and that the committee first receive leave to sue from the bankruptcy court—though relevant considerations, are not "necessarily a formalistic checklist." *Louisiana World*, 858 F.2d at 233.  The conflict of interest issue, for example, was the sole reason why the district court denied an administrative claimant derivative standing in *Robert F. Craig, P.C. v. Greenlight Capital Qualified, L.P. (In re Prosser)*, 469 B.R. 228 (D.V.I. 2012).  There, Greenlight Capital Qualified, L.P., Greenlight Capital, L.P. and Greenlight Capital Offshore, Ltd (collectively, "Greenlight"), obtained a state court judgment

of $56 million against Jeffrey Prosser ("Prosser") and recorded judgment liens on Prosser's property (the "Judgment Liens").   Greenlight filed an involuntary chapter 11 petition against Prosser.   The bankruptcy court entered an order for relief and converted Prosser's chapter 11 bankruptcy into a chapter 7 case.  Throughout the bankruptcy proceedings, Prosser was represented by the law firm of Robert F. Craig, P.C. (the "Craig Firm").

The Craig Firm asked the chapter 7 trustee to commence an adversary proceeding against Greenlight to avoid the Judgment Liens as preferential transfers, but the chapter 7 trustee refused after concluding that the claims lacked merit and that the litigation would be more costly than beneficial to the estate.  The Craig Firm sued Greenlight in its own name and moved the bankruptcy court for authority *nunc pro tunc* to pursue the preferential claims on behalf of the estate.  The bankruptcy court denied the motion on the ground that the Craig Firm was not an appropriate representative of the estate because it had a conflict of interest arising out of its representation of Prosser.  In that regard, the bankruptcy court noted that the Craig Firm was defending Prosser in two adversary proceedings initiated by the chapter 7 trustee seeking the denial of Prosser's discharge and the turnover of certain estate assets as well as in a contested matter brought by the chapter 7 trustee objecting to Prosser's claimed exemptions in the bankruptcy case.  On appeal, the Craig Firm argued that because the adversary proceeding in which it sought standing was against Greenlight, not the chapter 7 trustee or the estate, its stance in the other adversary proceedings and in the contested matter was irrelevant.  The district court rejected that argument, finding that a significant risk existed that the representation of the estate by the Craig Firm would be limited materially by its obligations to Prosser.

Like the Craig Firm, the Collateral Agent contends that the interests of the Trustee and the Collateral Agent are not in conflict because the claims against Mansfield will be pursued in the

Mansfield Adversary, and, therefore, the Collateral Agent will not be on both sides of the "v." This contention is the same form-over-substance argument that the district court in *Prosser* rejected. The Collateral Agent's proposal to file the third-party complaint in the Mansfield Adversary rather than in the Trustee Adversary does not eliminate the conflict but only makes it less obvious. These adversary proceedings have been consolidated and are set to be tried simultaneously because the claims of the Trustee and Mansfield are based on the same nucleus of operative facts. (Tr. Adv. Dkt. 28; M. Adv. Dkt. 105).

In the Trustee's Response, which was filed before the Mansfield's Response, the Trustee does not address the conflicts of interest issue among the parties. During the Hearing, counsel for the Trustee recognized the presence of a conflict but stated that the issue appeared to be related more to the rules of professional conduct for attorneys. (Hr'g at 11:07:33-11:08:33). Indeed, Rule 1.7(a) of the Mississippi Rules of Professional Conduct provides, "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless the lawyer reasonably believes: (1) the representation will not adversely affect the relationship with the other client and (2) each client has given knowing and informed consent after consultation." Miss. Rules of Prof'l Conduct r. 1.7; *see* Model Rules of Prof'l Conduct r. 1.7 (Am. Bar Ass'n 2019). Counsel for the Trustee surmised at the Hearing that counsel for the Collateral Agent had a professional responsibility to sort out the conflict on its own. Regardless of the Trustee's position, the Court cannot allow the Collateral Agent and its attorneys to proceed as representatives of the estate with such a clear conflict of interest. The Fifth Circuit in *In re American Airlines, Inc.,* 972 F.2d 605 (5th Cir. 1992), rejected any hands-off approach regarding ethical conduct and held that courts must be "sensitive to preventing conflicts of interest." *Id.* at 611.

## CONCLUSION

The Collateral Agent has failed to meet its burden of demonstrating the extraordinary circumstances necessary for the Court to grant it derivative standing to pursue claims against Mansfield on behalf of the chapter 7 bankruptcy estate.  The absence of clear, unequivocal consent to standing by the Trustee; the lack of a clear, colorable claim; and the irreconcilable conflicts of interest require the Court to deny the Derivative Standing Motion consistent with *Louisiana World*.

IT IS, THEREFORE, ORDERED that the Derivative Standing Motion is hereby denied.

##END OF OPINION##