

**SO ORDERED,**

**Judge Neil P. Olack**
**United States Bankruptcy Judge**
**Date Signed: February 26, 2021**

**The Order of the Court is set forth below. The docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**ON-SITE FUEL SERVICE, INC.,**                    **CASE NO. 18-04196-NPO**

**DEBTOR.**                                         **CHAPTER 7**

### MEMORANDUM OPINION AND ORDER
### APPROVING AMENDED FIRST APPLICATION FOR
### ALLOWANCE OF COMPENSATION FILED BY LISTON & DEAS, PLLC
### FOR SERVICES RELATED TO CLAIMS AGAINST CAPITALA/HARBERT

This matter came before the Court for a telephonic hearing on February 1, 2021 (the "Hearing"), on the Amended First Application for Allowance of Compensation Filed by Liston & Deas, PLLC for Services Related to Claims Against Capitala/Harbert (the "L&D Fee Application") (Bankr. Dkt. 409)[1] filed by Liston & Deas, PLLC ("L&D") as special counsel for Eileen N. Shaffer, the chapter 7 trustee (the "Trustee") for the bankruptcy estate of On-Site Fuel Service,

---

[1] Citations to the record are as follows: (1) citations to docket entries in the above-referenced bankruptcy case (the "Bankruptcy Case") are cited as "(Bankr. Dkt. __)"; and (2) citations to docket entries in *Eileen N. Shaffer, Chapter 7 Trustee for the Bankruptcy Estate of On-Site Fuel Service, Inc. v. Diesel Direct, Inc.; Capitala Finance Corp.; CapitalSouth Partners Fund II, L.P.; CapitalSouth Partners SBIC Fund III, L.P.; and Harbert Mezzanine Partners III SBIC, L.P.*, Adv. Proc. 20-00007-NPO (the "Trustee Adversary") are cited as "(Tr. Adv. Dkt. __)". On March 4, 2020, the Trustee Adversary was consolidated for discovery and trial purposes with *Mansfield Oil Company of Gainesville, Inc. v. Capitala Finance Corp., et al.*, Adv. Proc. 19-00059-NPO (the "Mansfield Adversary"). (Tr. Adv. Dkt. 28). Citations to the docket in the Trustee Adversary are to the docket in the Mansfield Adversary after the consolidation date.

Inc. ("On-Site"); the United States Trustee's Objection to Amended First Application for Allowance of Compensation Filed by Liston & Deas, PLLC for Services Related to Claims Against Capitala/Harbert (the "UST Objection") (Bankr. Dkt. 419) filed by David W. Asbach, Acting U.S. Trustee for Region 5 ("UST"); the letter response (the "Griffin Objection") (Bankr. Dkt. 422) filed by Andrea K. Griffin ("Griffin"), acting *pro se* (without representation of counsel); and the Liston & Deas PLLC's Reply to Objections to Amended First Application for Allowance of Compensation Filed by United States Trustee and Andrea Griffin (the "L&D Reply") (Bankr. Dkt. 427) filed by L&D in the Bankruptcy Case.  Three (3) exhibits are attached to the L&D Fee Application:  the Joint Venture Co-Counsel Agreement (the "JV Agreement") (Bankr. Dkt. 409-1) signed by L&D, Mitchell, McNutt & Sams ("MMS"), and the Trustee on October 28, 2019; an itemization of hours billed by L&D from December 2, 2019 through November 13, 2020 (the "Fee Itemization") (Bankr. Dkt. 409-2); and an itemization of expenses incurred by L&D during the same time period (the "Itemization of Expenses") (Bankr. Dkt. 409-3).  At the Hearing, William L. Liston, III represented L&D; Donald Andrew Phillips represented MMS; the Trustee, a licensed attorney, represented herself; Christopher J. Steiskal, Sr. represented the UST; Griffin represented himself; and E. Barney Robinson III represented Harbert Mezzanine Partners III SBIC, L.P. ("Harbert") and John C. Harrison ("Harrison").

A component of the fees sought by L&D in the L&D Fee Application is a contingent fee based on the amount of funds saved On-Site's bankruptcy estate.  The Court instructed L&D and the UST to file letter briefs addressing whether it is proper for an attorney retained under 11 U.S.C. § 327 to charge a "reverse" contingent fee, that is, a fee based on the amount saved the client rather than the amount of the client's net recovery.  *See Contingent Fee*, BLACK'S LAW DICTIONARY (11th ed. 2019).  L&D submitted its letter brief on February 8, 2021 (the "L&D Letter Brief")

(Bankr. Dkt. 442), and the UST filed his letter brief on February 10, 2021 (the "UST Letter Brief") (Bankr. Dkt. 446).

## Jurisdiction

The Court has jurisdiction over the parties to and the subject matter of this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (O). Notice of the Hearing was proper under the circumstances.

## Facts[2]

On October 30, 2018, Mansfield Oil Company of Gainesville, Inc. ("Mansfield") filed a chapter 7 involuntary petition (the "Involuntary Petition") (Bankr. Dkt. 1) against On-Site, a fuel-supply business. The Involuntary Petition was contested and litigated for several months. After a trial, the Court entered the Order for Relief (the "Order for Relief") (Bankr. Dkt. 159) on May 24, 2019, and Stephen Smith was appointed the chapter 7 trustee. He resigned on September 13, 2019, and the current Trustee was appointed to replace him that same day. (Bankr. Dkt. 255, 256).

Capitala Finance Corp., Capitala South Partners Fund II, L.P., Capitala South Partners SBIC Fund III, L.P., and Harbert (collectively, "Capitala/Harbert") filed proofs of claim 49, 50, 51 and 54 (Claim #49-51, 54) asserting a total principal debt of $17,044,999.85 incurred by On-Site under various Senior Subordinated Secured Notes. Capitala/Harbert alleged a perfected security interest in substantially all of the assets of On-Site. John F. McGlinn ("McGlinn") and Harrison each filed a proof of claim (Claim #52, 55) asserting unsecured claims in an unknown

---

[2] The following findings of fact and conclusions of law are made pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure. For a more thorough discussion of the background and procedural history, see the Memorandum Opinion and Order Denying Mansfield's Motion for Partial Summary Judgment. (Tr. Adv. Dkt. 488).

amount for indemnification and contribution based on their respective rights as members of On-Site's board of directors.

On November 27, 2019, the Court entered the Order (the "Retention Order") (Bankr. Dkt. 287) granting the application of the Trustee to employ L&D as special counsel "to pursue generally all Causes of Action related to equitable and tort theories" in accordance with the JV Agreement. The Retention Order provided that L&D would be entitled to receive compensation and reimbursement of expenses "only after notice and a hearing as contemplated by [11 U.S.C.] § 330, Bankruptcy Rule 2016, and any other applicable or related statutes and rules." (Bankr. Dkt. 287 at 3).

The JV Agreement sets forth a hybrid or blended-fee structure. Compensation for legal fees are paid at a reduced hourly rate of $150.00 and "a contingency fee of 27.5% of all sums recovered on behalf of the estate, provided that funds are available to pay the accrued hourly rates set forth in the preceding clause." (Bankr. Dkt. 409-1 ¶ 4). If no funds are available to pay the accrued hourly billings, then L&D and MMS shall receive "from any funds recovered on behalf of the estate" a forty percent (40%) contingent fee. (Bankr. Dkt. 409-1 ¶ 4). L&D and MMS agreed to divide any contingent fees sixty percent (60%) to L&D and forty percent (40%) to MMS. (Bankr. Dkt. 409-1 ¶ 7). The JV Agreement also provides for reimbursement of all actual and necessary expenses. Notwithstanding these provisions, the Trustee agreed to pay L&D and MMS an hourly rate of $350.00 plus expenses from the date of the Order for Relief entered on May 24, 2019 through the date of the JV Agreement signed on November 28, 2019. (Bankr. Dkt. 409-1 ¶ 4).

**Trustee Adversary**

On February 3, 2020, L&D initiated an adversary proceeding on behalf of the Trustee against Capitala/Harbert for equitable subordination pursuant to 11 U.S.C. § 510(c).[3]  (Tr. Adv. Dkt. 1).  Under that statute, "the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. . . or . . . order that any lien securing such subordinated claim be transferred to the estate."  *Id*.  The Fifth Circuit Court of Appeals in *In re Mobile Steel Co.*, 563 F.2d 692 (5th Cir. 1977), created a three-part test for equitable subordination under § 510(c):  (1)  the claimant engaged in some inequitable conduct; (2)  the conduct resulted in injury to creditors of the bankruptcy estate or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim is not inconsistent with a provision of the statutory bankruptcy law.  *Mobile Steel Co.*, 563 F.2d at 700.

With the Court's permission, the Trustee filed the First Amended Complaint (the "Amended Complaint") (Tr. Adv. Dkt. 27) asserting the same equitable subordination claim and a new claim for declaratory relief regarding the extent of Capitala/Harbert's lien on certain assets of the estate.  In the twenty-five (25) page Amended Complaint, the Trustee alleged that McGlinn and Harrison, acting at the behest of Capitala/Harbert, directly participated in inequitable conduct that harmed On-Site and was intended to harm or defraud Mansfield.  According to the Trustee, Capitala/Harbert exercised control over On-Site's assets and business decisions through their appointment of four members of On-Site's five-member board of directors.  (Tr. Adv. Dkt. 27 ¶ 25(a)).  McGlinn, a senior managing director and chief operating officer of Capitala, served as

---

[3] All references to code sections are to the U.S. Bankruptcy Code (the "Code") found at title 11 of the U.S. Code unless otherwise noted.

chairman of On-Site's board of directors.  (Tr. Adv. Dkt. 27 ¶ 26).  Harrison, a senior managing director of Harbert, also served as a member of On-Site's board of directors.  (Tr. Adv. Dkt. 27 ¶ 27).  In 2017, McGlinn and Harrison formed a two-member "Special Committee" for the purpose of pursuing strategic options for On-Site, and, in particular, a strategic alliance with Mansfield, a nationwide supplier of petroleum products.  (Tr. Adv. Dkt. 27 ¶ 30).

The Trustee alleged that during discussions with Mansfield concerning the proposed strategic alliance, On-Site disclosed 2017 financial statements that reflected positive EBITDA of approximately $300,000.00 per month.  (Tr. Adv. Dkt. 27 ¶ 31).  Also, McGlinn, or others under his direction, allegedly prepared On-Site's 2018 budget forecasting positive EBITDA of approximately $4.3 million.  The Trustee asserted that this information was materially inaccurate.  (Tr. Adv. Dkt. 27 ¶ 32).  Mansfield and On-Site signed the Strategic Alliance and Acquisition Option Agreement (the "SAA") on April 12, 2018.   Under the SAA, Mansfield became the exclusive supplier of fuel to On-Site and assumed the responsibility of billing On-Site's customers.

At some point, McGlinn informed Mansfield that On-Site's lender, PNC Financial Services Group, Inc. ("PNC Bank"), would not agree to the strategic alliance unless On-Site paid off its debt to PNC Bank.  (Tr. Adv. Dkt. 27 ¶ 35).  Mansfield thereafter agreed to loan On-Site $4.8 million for this purpose.  The resolution of PNC Bank's objection allowed the strategic alliance to become effective on that same date.  The Trustee contends that McGlinn persuaded Mansfield to enter into the loan by representing that On-Site anticipated receipt of $6 million "in collectable cash inflows in the near term" when McGlinn knew that On-Site was financially unstable.  (Tr. Adv. Dkt. 27 ¶ 35; Tr. Adv. Dkt. 27-3, Ex. 3).

The Trustee alleged that through early September 2018, McGlinn and On-Site's executive officers continued to assure Mansfield of On-Site's financial stability and ability to perform, even

though they purportedly were cognizant of On-Site's rapidly deteriorating financial condition.  (Tr. Adv. Dkt. 27 ¶ 38; Tr. Adv. Dkt. 27-4 to 27-8, Exs. 4-8).  According to the Trustee, On-Site then breached the SAA by failing to pay fully its debt to Mansfield, including repayment of the $4.8 million loan to On-Site to payoff PNC Bank.  (Tr. Adv. Dkt. 27 ¶ 41).  The Trustee contended that at this time On-Site owed Mansfield approximately $5,892,161.00 with no ability to repay the debt.  (Tr. Adv. Dkt. 27 ¶ 42).

A meeting was held on October 4, 2018 to discuss On-Site's alleged breach.  The Trustee asserted that at the meeting, McGlinn and On-Site's executives presented information reflecting a financial performance that sharply deviated from On-Site's prior representations to Mansfield, including a significant decrease in On-Site's business volume and a $1.4 million loss from operations through August 2018.  (Tr. Adv. Dkt. 27 ¶ 42).  Days after the meeting, On-Site provided a financial report to Mansfield that concluded that for the twenty (20) months ending on August 31, 2018, "[On-Site was] not generating sufficient cash flow to service its truck and equipment loans, pay cash interest, fund capital expenditures, and absorb non-operating expenses." (Tr. Adv. Dkt. 27 ¶ 43; Tr. Adv. Dkt. 27-9, Ex. 9).  Upon receipt of this information, Mansfield ceased making any payments to On-Site.  (Tr. Adv. Dkt. 27 ¶ 44).

According to the Trustee, McGlinn closed On-Site on October 22, 2018 and disposed of On-Site's assets in a "fire sale" on October 31, 2018 in a manner that minimized their value and that placed the interests of Capitala/Harbert above the interests of On-Site's other creditors.  (Tr. Adv. Dkt. 27 ¶ 47).  The Trustee alleged that McGlinn's actions constituted a breach of his duties of care, loyalty, and fair dealing.  (Tr. Adv. Dkt. 27 ¶ 48; Tr. Adv. Dkt. 27-1, Ex. 1; Tr. Adv. Dkt. 27-10, Ex. 10; Tr. Adv. Dkt. 27 ¶ 58).  As relief, the Trustee asked the Court to subordinate the bankruptcy claims of Capitala/Harbert against On-Site to the level of equity.

**Settlement of Trustee Adversary**

The Trustee's equitable subordination claim against Capitala/Harbert was settled and resolved, with the settlement approved by the Court on November 6, 2020.  (Bankr. Dkt. 384). Pursuant to the settlement, Capitala/Harbert, McGlinn, and Harrison agreed to contractually subordinate their claims against On-Site's bankruptcy estate to the allowed claims of all other creditors with respect to the estate funds held by the Trustee (the "Estate Funds") in the then current amount of $432,321.93 and to certain "estate claims."  (Bankr. Dkt. 372-1 at 1-2).  For purposes of the settlement, "estate claims" are defined as including commercial tort claims, actions brought under chapter 5 of the Code, any monies owed to or held for On-Site by any insurer, lessor, or any state or federal government agency or authority, and fifty percent (50%) of the net recovery from the collection of On-Site's accounts receivable.  (Bankr. Dkt. 372-1 at 2).  The Trustee assigned to Capitala/Harbert the estate's interest in any accounts receivable and agreed that any net recoveries by Capitala/Harbert would be split equally between the estate and Capitala/Harbert. (Bankr. Dkt. 372-1 at 4).  The alleged claims of Capitala/Harbert against Mansfield or any of its officers, directors, or employees, however, are not contractually subordinated.  No objection to the settlement was filed.

**L&D Fee Application**

L&D filed the L&D Fee Application seeking compensation for legal services performed by William Liston, III ("Liston") and Lawrence Deas ("Deas") from December 2, 2019 to November 13, 2020 related solely to the Trustee's equitable subordination claim against Capitala/Harbert.  The L&D Fee Application is the first fee application filed by L&D, and "[n]either L&D nor MMS contemplate[s] filing any additional applications for compensation related to the claims asserted in the adversary against Capitala/Harbert."  (Bankr. Dkt. 409-1 ¶ 7).

The Fee Itemization shows that Liston and Deas expended 391.6 hours in pursuing the Trustee's claim against Capitala/Harbert resulting in total fees of $58,740.00 based on a reduced hourly rate of $150.00. The Expense Itemization indicates that L&D expended $10,121.90 in expenses for which L&D seeks reimbursement pursuant to the JV Agreement.

L&D requests an additional contingent fee of $97,953.81 based upon application of a 27.5% contingent fee to $356,159.69, the amount of Estate Funds held by the Trustee at the time of the Hearing.[4] When added to the hourly fees of $58,740.00, L&D seeks total fees of $156,693.81. Upon approval of payment of the contingent fee of $97,953.81, L&D seeks permission to pay forty percent (40%) of that amount ($39,181.52) to MMS pursuant to the JV Agreement.

**Griffin Objection**

In the Griffin Objection, Griffin contests payment of any compensation to L&D or to any other persons or firms "whereby my name is attached" and requests that his name be removed "from any further mailing correspondence." (Bankr. Dkt. 422). Griffin stated at the Hearing that he is a former employee of On-Site and that he filed the Griffin Objection because he did not want to pay any fees and expenses. After being informed that approval of the L&D Fee Application would not render him personally liable for payment of any of the fees or expenses, Griffin asked for permission to withdraw the Griffin Objection. He specifically requested that he continue receiving notices in the Bankruptcy Case.

---

[4] At the time of the settlement, the balance of the Estate Funds was $432,321.93, but L&D seeks compensation based on the lower balance of the Estate Funds at the time of the Hearing.

**UST Objection & UST Letter Brief**

In the UST Objection, the UST contends that the request for $97,953.81 in contingency-based compensation does not comply with the terms of the Retention Order or, more specifically, the JV Agreement because the Estate Funds are not "sums recovered." (Bankr. Dkt. 419 at 3). The UST does not argue that the reduced hourly fees of $58,740.00 are unreasonable, either as to the time expended by L&D or the billing rate charged, and the UST does not contest the amount of expenses.

The UST Objection was unclear as to whether the UST disputed both the meaning of "sums recovered" in the JV Agreement and the validity of reverse contingent fees. At the Hearing, the UST clarified that he objected to the L&D Fee Application on both grounds. He argued that "sums recovered" was not defined in the JV Agreement to include amounts saved the estate and, moreover, that contingent fees are permissible only when based on new funds paid into the estate. The UST Letter Brief, however, addresses only the plain meaning of "sums recovered." (Bankr. Dkt. 446). When questioned at the Hearing, the UST opposed a quantum meruit recovery of fees based on the time expended at L&D's customary billing rate.

**L&D Reply & L&D Letter Brief**

L&D describes the UST's construction of "sums recovered" in the JV Agreement as "hyper-technical." (Bankr. Dkt. 427 at 1). L&D maintains that the UST's argument fails to consider other ordinary meanings of the term "recover" and ignores the benefit to the bankruptcy estate resulting from the contractual subordination of the claims of Capitala/Harbert. The satisfaction of Capitala/Harbert's lien, according to L&D, would have exhausted all of the Estate Funds. In the L&D Letter Brief, L&D reiterates its request for reverse contingent fees of $97,953.81. In the alternative, L&D requests that the Court enhance the reduced hourly rate of

$150.00 and award compensation for the time L&D expended in prosecuting the equitable subordination claim at the market rate.

**Hearing**

At the Hearing, the Trustee testified in full support of payment of the fees and expenses requested by L&D, including the reduced contingent fee of $97,953.81.  (Tr. Test. at 2:20:43-2:21:54 (Feb. 1, 2021)).[5]  Her testimony clarified that the Estate Funds were encumbered by a valid, perfected lien held by Capitala/Harbert.  Absent the settlement, the estate would have had to write a check to Capitala/Harbert in the amount of the Estate Funds.  (Tr. Test. at 2:23:51-2:24:08).  She described the litigation against Capitala/Harbert as "complex" and could not guarantee that the estate would have sufficient funds to compensate L&D at its customary hourly rate.  She viewed the low-percentage contingent fee as another mechanism to compensate special counsel and believed the blended-fee structure was "extremely fair for the bankruptcy estate and the only way to have this case more forward."  (Tr. Test. at 2:22:00-2:22:08).  She testified that she read the JV Agreement as applying a contingent fee based on either the amount of new money recovered or the amount no longer subject to Capitala/Harbert's lien.  (Tr. Test. at 2:25:07-2:25:27).  Specifically, she testified that she fully understood and agreed at the outset of her retention of L&D as special counsel to a fee structure with both an hourly rate and the potential for a straight or reverse contingent fee.  (Tr. Test. at 2:20:08-2:20:25).

**Discussion**

A.      **Reverse Contingent Fee**

The parties have not found any controlling authority in the Fifth Circuit that addresses reverse contingent fees for legal services that benefit a bankruptcy estate through the equitable

---

[5] The Hearing was not transcribed.  Citations are to the timestamp of the audio recording.

subordination of claims.  Both L&D and the UST point to *Adam v. Weinman (In re Adam Aircraft Industries, Inc.)*, 532 B.R. 814 (D. Colo. 2015) (*Adam Aircraft II*), a non-binding decision from the U.S. District Court for the District of Colorado ("District Court").  Because the facts are analogous, *Adam Aircraft II* merits discussion.

Adam Aircraft Industries, Inc., ("Adam Aircraft"), a manufacturer of small aircraft, filed a chapter 7 petition for relief.  Morgan Stanley Senior Funding, Inc. and Morgan Stanley & Co., LLC, on behalf of themselves and a consortium of other lenders (collectively, "Morgan Stanley") asserted secured claims totaling $56,576,505.84.  The chapter 7 trustee sold the assets of the estate for $10 million and entered into a stipulation with Morgan Stanley, approved by the bankruptcy court, regarding the division and interim distribution of the sale proceeds.  They agreed that $2,681,083.00 would be reserved for the holders of disputed competing liens.  After deducting certain other amounts, they agreed to divide the remaining sale proceeds 91% to Morgan Stanley and 9% to the estate.  Pursuant to that stipulation, the chapter 7 trustee distributed $5,826,837.30 of the sale proceeds to Morgan Stanley and retained $581,255.45 for the estate free of any liens.

Later, the chapter 7 trustee suspected that Morgan Stanley's actions shortly before the bankruptcy filing may have caused Adam Aircraft's sudden financial decline and retained the law firm of Allen & Vellone as special counsel to investigate Morgan Stanley's pre-petition conduct.  Compensation for this representation was to be based upon the firm's hourly rate of $375.00 for Patrick D. Vellone ("Vellone").  *Id*. at 816.  The firm concluded from its investigation that the estate had viable causes of action against Morgan Stanley but declined the trustee's request to pursue the litigation solely on a contingent fee basis.  Ultimately, the trustee negotiated a hybrid hourly and contingent fee arrangement with Allen & Vellone.

The Modified Contingency Fee Agreement provided for compensation at an hourly rate of

75% of the firm's normal hourly rate plus a contingent fee of fifteen percent (15%) of any "gross amount recovered" by the firm on behalf of the estate. The phrase "gross amount recovered" was defined in the Modified Contingency Fee Agreement as "the total amount recovered before any subtraction of expenses and disbursements, including . . . any reduction in the Client's liability to the Defendants under the Bankruptcy Code." *Id*. at 816.

Allen & Vellone initiated an adversary proceeding on behalf of the trustee seeking equitable subordination or disallowance of Morgan Stanley's secured and unsecured claims and remission to the estate of approximately $36 million that Morgan Stanley had been paid on the loan. *Id*. at 817. Morgan Stanley filed a motion to dismiss for failure to state a claim, which the bankruptcy court denied. Without engaging in any formal discovery, Allen & Vellone negotiated a settlement in which Morgan Stanley agreed to assign its secured claims to the trustee and subordinate its unsecured claims to those of all other creditors.

The trustee estimated that the value of the settlement to the estate was at least $3,097,952.99. *Id*. at 818. The assignment of Morgan Stanley's secured claim saved the estate $1,794,535.72, which the trustee calculated by deducting $709,065.72 (the amount of a competing lien) from $2,681,083.00 (the reserved sale proceeds) and multiplying the difference by 91% ($1,794,535.82 = ($2,681,083.00 − $709,065.72) × 0.91). The subordination of Morgan Stanley's unsecured claim of approximately $50.7 million saved the estate $1,303,417.27. The trustee estimated that all unsecured claims totaled $111 million and that Morgan Stanley's unsecured claim constituted 45.72% of that total. Thus, Morgan Stanley had a 45.72% interest in

unencumbered funds of $2,850,868.92.[6]  According to the trustee, the total savings to the estate was $3,097,952.99, the sum of $1,794,535.72 and $1,303,417.27.

Allen & Vellone filed a fee application seeking approval of $538,085.95 in attorney's fees and $10,154.82 in costs.  The hourly component of the requested fee award was $73,086.37, and the contingent-fee component was $464,996.58 or fifteen percent (15%) of $3,099,977.22,[7] the amount of the "gross amount recovered" in the form of a reduction in the estate's liability.  *Id*. at 818-19.

George F. Adam ("Adam"), the founder of Adam Aircraft and its largest shareholder, objected to the contingent-fee portion of the fee application.  He argued that the settlement did not benefit the estate.  Allen & Vellone, in turn, argued that the contingent fee was permissible "despite the fact cash was not recovered" since "[p]rior to the settlement agreement the trustee would have been required to turn over to Morgan Stanley all of the money in the estate's account."  *Adam v. Weinman (In re Adam Aircraft Indus., Inc.)*, No 08-1151,  2013 WL 414213, *2-3 (Bankr. Colo. Feb. 1, 2013).

The bankruptcy court found that under § 327 and § 328, the threshold issue was whether the legal services benefitted the estate.  It further found that "[b]enefit to the estate can take many forms and is not restricted to monetary benefit."  *Id*., at *4.  Without the settlement, the trustee would have been required to turn over to Morgan Stanley all of the money in the estate's accounts

---

[6] The unencumbered funds of $2,850,868.92 consisted of $241,297.47 (9% of the remaining sale proceeds not covered by Morgan Stanley's security interest), $581,255.45 (the trustee's carve-out proceeds), and $2,028,316.00 (the amount recovered by the trustee in other actions). *Adam Aircraft II*, 532 B.R. at 818.

[7] This number is higher than the $3,097.952.99 originally determined by the trustee to be the amount of savings to the estate because of a reduction in the $709,065.72 competing lien as the result of an appeal. *Id*. at 819 n.6.

except the carveout proceeds and the proceeds recovered from avoidance actions. The bankruptcy court found that as a result of the settlement, "all of the estate's unencumbered funds may be paid to unsecured creditors other than Morgan Stanley, resulting in a benefit to the estate, and rendering the award of a contingent fee appropriate under the Modified [Contingency] Fee Agreement." *Id.* The bankruptcy court mentioned the factors in § 330 but did not discuss or weigh them, guided by the decision of the U.S. Bankruptcy Appellate Panel of the Tenth Circuit (the "BAP") in *In re Market Center East Retail Property, Inc.*, 469 B.R. 44 (B.A.P. 10th Cir. 2012). There, the BAP held that in awarding fees under § 330, bankruptcy courts are not limited to the "lodestar" approach. *Id.* at 50-54.

Adam appealed the bankruptcy court's decision to award fees based on the contingent fee arrangement. The District Court noted that after the bankruptcy court issued its decision, the Tenth Circuit Court of Appeals in *In re Market Center East Retail Prop., Inc.*, 730 F.3d 1239, 1244-45 (10th Cir. 2013), overturned the BAP's decision. *See Adam v. Weinman (In re Adam Aircraft Indus., Inc.)*, No. 13-cv-01235, 2014 WL 1133232 (D. Colo. Mar. 21, 2014) (*Adam Aircraft I*). The District Court remanded to the bankruptcy court for an analysis of the reasonableness of the requested attorney's fees under § 330(a) and the factors articulated in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *See Adam Aircraft I*, 2014 WL 1133232, at *3.

On remand, the bankruptcy court analyzed the fee application under the criteria set forth in § 330(a) and *Johnson* and once again approved the fees requested by Allen & Vellone. *In re Adam Aircraft Indus., Inc.*, No. 08-11751, Dkt. 1307 (Bankr. Colo. Sept. 12, 2014). Adam appealed the bankruptcy court's remand decision. He argued that Colorado's Rules Governing Contingent Fees, COLO. R. CIV. P. ch. 23.3, and related case law based contingent fees on amounts actually

recovered, not on amounts saved. *Adam Aircraft II*, 532 B.R. at 824. He also argued that determining the dollar amount saved for a client is a matter of speculation and thus unreasonable.

In rejecting Adam's arguments, the District Court relied on testimony by Vellone and the trustee. *Id.* at 819. Vellone testified that most lender liability cases are resolved by a reduction in claims and do not involve cash payments by the lender. The trustee testified that his expectation in filing the lawsuit was that it would result in a release of Morgan Stanley's lien on the estate funds, and he never envisioned that Morgan Stanley would actually write a check of any amount to the bankruptcy estate. The District Court placed importance on the fact that the trustee, rather than Allen & Vellone, proposed the employment on a contingency basis but Allen & Vellone was unwilling to undertake the risk of equitable subordination litigation on a pure contingent-fee basis. Instead, Allen & Vellone proposed that a reduced-rate hourly component be included in the Modified Contingency Fee Agreement.

In reaching its holding, the District Court found that a contingent fee may be awarded absent an influx of funds to the estate. Indeed, the District Court found that it was not irrational to base a contingent fee on a reduction of liability since Morgan Stanley's security interest, if enforced, "would consume most if not all of the estate's remaining funds," and "the trustee's primary objective in pursuing the adversary proceeding was to retain the funds in the estate's bank account by getting rid of Morgan Stanley's claims." *Id*. at 824. This conclusion, according to the District Court, left only the question of whether basing a contingent fee on a reduction in liability is legally valid.

The District Court rejected Adam's argument that the law of Colorado applied because the award of professional fees in bankruptcy proceedings are governed by federal, not state law. *Id*. at 825 (citing *In re 5900 Assocs., Inc.*, 486 F.3d 326, 329 (6th Cir. 2006)). Nevertheless, the

District Court found that Colorado law would authorize a contingent fee based on a reduction of liability, given that Colorado's Contingent Fee Rules define a "contingent fee agreement" as one "under which compensation is to be contingent . . . upon the successful accomplishment or disposition of the subject matter of the agreement." *Id.*  Thus, under Colorado law, "[t]he clear inference is that contingent fees are not necessarily based on 'amounts collected' by the attorney." *Id*.

The District Court cited the "reduction of liability" language in the Modified Fee Agreement and the bankruptcy court's ultimate authority to determine a reasonable fee under § 330 in reaching its conclusion that a contingent fee need not be based on an influx of cash but can be based on a reduction of the client's liability "so long as the reduction or 'savings' can reasonably be determined." *Adam Aircraft II*, 532 B.R. at 826.  After reviewing the method used by Allen & Vellone to calculate the savings to the estate, the District Court found that it was reasonable to assess the contingent fee based on the amount of funds preserved for the estate through equitable subordination.  In sum, the District Court overruled Adam's objections to payment of the contingent fee to special counsel and affirmed the bankruptcy court's calculation of the contingent fee based upon the savings to the estate arising from the equitable subordination of Morgan Stanley's claims.

The UST points out, and L&D admits, that the facts in *Adam Aircraft II* are not wholly analogous to those presented here.  (Bankr. Dkt. 442 at 5; Bankr. Dkt. 446 at 4).  Unlike the Modified Contingency Fee Agreement in *Adam Aircraft II*, the JV Agreement does not refer to a "reduction of liability" or expound upon the meaning of "sums recovered."  The UST questions whether the parties intended to enter into a reverse contingent fee arrangement.

L&D recognizes the absence of a definition of "sums recovered" in the JV Agreement but

argues that the ordinary meaning of "recover" is broad enough to include more than just the receipt of cash.[8] (Bankr. Dkt. 442 at 5). L&D cites the *Merriam-Webster Dictionary* for its alternative definitions of "recover" and, in particular, relies upon the definition, "to save from loss and restore to usefulness." (Bankr. Dkt. 442); *see Recover*, Merriam-Webster.com, http://merriam-webster.com/dictionary/recover (last visited Feb. 23, 2021). L&D also cites numerous decisions where courts have adopted other dictionary definitions of "recover," such as: "the obtainment of a right to something," *Wampold v. E. Eric Guirard & Assocs.*, 442 F.3d 269, 272 (5th Cir. 2006); "the restoration or vindication of a right," *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co.*, 522 F.3d 776, 787 n.15 (7th Cir. 2008); "to gain by legal process," *St. Paul Fire & Marine Ins. Co. v. Farner*, 648 F.2d 489, 490 (8th Cir. 1981); "obtaining . . . of some right or property which has been taken or withheld," *Ga. Dep't of Admin. Servs. v. Zhang*, 819 F. App'x 684, 689 (11th Cir. 2020); and "to obtain by judgment or other legal process," *Kan. Penn Gaming, LLC v. HV Props. of Kan., LLC*, 790 F. Supp. 2d 1307, 1312 (D. Kan. 2011). L&D contends that the litigation achieved "the obtainment of a right to something''—the Estate Funds—to which all creditors except Capitala/Harbert were "save[d] from loss and restore[d] to usefulness." (Bankr. Dkt. 427 at 3).

The Trustee's testimony at the Hearing demonstrates that the settlement was the equivalent of the Trustee paying Capitala/Harbert the Estate Funds on which Capitala/Harbert asserted a lien and Capitala/Harbert, in turn, writing a check to the Trustee in the same amount.[9] The Court

---

[8] L&D could have defined "sums recovered" in the JV Agreement to include any savings to the estate from the subordination of all or part of Capitala/Harbert's allowed claims. If it had done so, L&D would not have had to argue the various definitions of "recover."

[9] In the Trustee Adversary, the Trustee did not dispute the priority or the validity of Capitala/Harbert's liens on the Estate Funds. (Tr. Adv. Dkt. 27).

agrees with L&D that a fair reading of the JV Agreement is that the phrase "sums recovered" includes more than the influx of new money and applies to the Estate Funds. ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 101-106 (2012). After all, the only form of relief sought against Capitala/Harbert in the Trustee Adversary was the equitable subordination of their claims and a declaratory judgment. Why then would L&D agree to a contingent fee based solely on the influx of new money into the estate? Moreover, to adopt the UST's analysis would conflict not only with L&D's understanding of the JV Agreement but also with the Trustee's. Neither L&D nor the Trustee read any ambiguity into the phrase "sums recovered" from the inception of the fee arrangement. As L&D makes clear, "[t]he reality is that without a contingency fee component in the JV Agreement, L&D would not have undertaken employment by the Trustee." (Bankr. Dkt. 442 at 7). Having determined that the JV Agreement provides for the potential of a reverse contingent fee, the Court turns to the next issue raised by the UST at the Hearing, the validity per se of reverse contingent fees.

Even assuming state law applies, Mississippi has no counterpart to the Colorado Contingent Fee Rules discussed by the District Court in *Adam Aircraft II*. The Court notes that Rule 1.5 of the Mississippi Rules of Professional Conduct ("Rule 1.5") provides that "[a] fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law." MISS. R. PROF'L CONDUCT 1.5(c). Rule 1.5(d) prohibits contingent fees in domestic relations and criminal matters. There is no express prohibition in Rule 1.5, however, against reverse contingent fees.

Rule 1.5 is substantially identical to Rule 1.5 of the Model Rules of Professional Conduct ("Model Rule 1.5") drafted by the American Bar Association ("ABA"). In 1993, the ABA Committee on Ethics and Professional Responsibility (the "ABA Committee") issued a formal

opinion concluding that Model Rule 1.5 does not prohibit reverse contingent fees in civil cases based on the amount of money saved the client, "provided the amount saved is reasonably determinable, the fee is reasonable in amount under the circumstances, and the client's agreement to the fee arrangement is fully informed." ABA COMM. ON ETHICS & PROF'L RESPONSIBILITY, Formal Op. 93-373 (1993). The UST in the UST Letter Brief does not provide any authority to the contrary. Guided by *Adam Aircraft II* and the ABA's formal opinion, the Court, therefore, rejects the UST's argument at the Hearing that reverse contingent fees are invalid per se. The Court turns next to the reasonableness of the fees and expenses sought by L&D.

**B. Standard for Awarding Compensation**

Under § 330, a bankruptcy court may award a debtor "reasonable compensation for actual, necessary services rendered by . . . [a] professional person" employed by the estate. 11 U.S.C. § 330(a)(1)(A). In considering "the nature, the extent, and the value of such services," § 330(a)(3) requires that courts take into account all relevant factors, including:

(A)    the time spent on such services;

(B)    the rates charged for such services;

(C)    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E)    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3)(A)-(F).

If a court awards professional compensation under § 330(a), the amount of such compensation or reimbursement is entitled to priority status as an administrative expense under § 503(b)(2).   4 COLLIER ON BANKRUPTCY ¶ 503.09 (16th ed. 2021).   Section 503(b) allows administrative expenses that are "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).   Because fees awarded under this section are paid directly from the estate and reduce the funds available to other creditors, courts traditionally strictly construe § 503(b).   *E.g.*, *In re Enloe*, No. 14-36358, 2016 WL 4595921, at *2 (Bankr. S.D. Tex. Sept. 2, 2016).   Thus, the administrative expenses approved for an attorney must be "reasonable" and claims should be "narrowly construed" so as to keep administrative expenses at a minimum.   *In re DeSardi*, 340 B.R. 790, 799 (Bankr. S.D. Tex. 2006) (citing *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 865 (4th Cir. 1994)).   The burden of proof is on the applicant to establish their entitlement to an award under § 503(b), and the movant must demonstrate by a preponderance of the evidence that the work reflected in fees constitutes a substantial contribution to the estate.   *E.g.*, *In re Buttes Gas & Oil Co.*, 112 B.R. 191, 193 (Bankr. S.D. Tex. 1989).

In assessing fee applications, the Fifth Circuit has held that courts should apply the lodestar method in concert with the *Johnson* factors.[10]   *CRG Partners Grp., LLC v. Neary (n re Pilgrim's Pride Corp.)*, 690 F.3d 650, 655-56 (5th Cir. 2012).   Under the lodestar method, a court first determines the compensable hours billed and then calculates a reasonable hourly rate for the

---

[10] The twelve factors articulated in *Johnson* are as follows: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill necessary to properly perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fees charged; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the court or the client; (8) the amount of money involved in the case and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship between the attorney and the client; and (12) fees awarded in similar cases. *Johnson*, 488 F.2d at 717-19.

compensable services. *Black v. SettlePou, P.C.*, 732 F.3d 492, 502 (5th Cir. 2013). The resulting

sums are multiplied to arrive at the lodestar amount. *Pilgrim's Pride Corp.*, 690 F.3d at 655. In

*Perdue v. Kenny ex rel. Winn*, 559 U.S. 542, 551 (2010), the U.S. Supreme Court emphasized the

importance of the lodestar approach for calculating the reasonableness of professional fees. These

holdings create a framework under which a bankruptcy court determines the proper compensation

of professionals employed by the estate: the lodestar method, § 330(a), and the *Johnson* factors.

The Court begins by calculating the lodestar amount.

**C.      Reasonableness & Necessity of L&D's Fees**

    **1.      Lodestar Calculation**

        **a.      Reasonable Hours Expended**

L&D billed 391.6 hours for service rendered by Liston and Deas from December 2, 2019

to November 13, 2020. Before initiating the Trustee Adversary, L&D's primary task was

reviewing voluminous documents and researching potential claims against Capitala/Harbert. After

the initiation of the Trustee Adversary, L&D engaged in discovery, including at least twelve (12)

depositions, some of which took place over several days. L&D also responded to a motion for

derivative standing and pursued a partial summary judgment motion. L&D additionally attended

several hearings and status conferences. The Court finds that the hours expended by L&D were

reasonable. The UST does not argue otherwise.

        **b.      Prevailing Hourly Rate in the Community for Similar Work**

It is well settled that "reasonable" hourly rates "are to be calculated according to the

prevailing market rate in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 896 (1984).

The Fifth Circuit has interpreted "relevant community" to mean that courts must consider the

customary fee for similar work "in the community." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374,

381 (5th Cir. 2011). In determining the reasonableness of hourly rates, a court relies on evidence submitted by the applicant as to the rates it customarily charges and the court's own knowledge of comparable rates charged by lawyers.

In this district, courts have approved hourly billing rates up to $400.00. *See United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 1:06CV433-HSO-RHW, 2014 WL 691500, at *5 (S.D. Miss. Feb. 21, 2014). Moreover, this Court has approved a billing rate of $450.00 per hour in *In re Natchez Reg'l Med. Ctr.*, No. 14-01048-NPO, Dkt. 349 (Bankr. S.D. Miss. July 22, 2014). A billing rate of $440.00 per hour also was approved in *In re Simply Wheelz LLC*, No. 13-03332-EE, Dkt. 632 (Bankr. S.D. Miss. Aug. 7, 2014). The Court finds that the hourly billing rate for Liston and Deas of $150.00 in the L&D Fee Application is extremely reasonable and at the lower end of the market rate charged by experienced attorneys like Liston and Deas for comparable work. The Court also finds that Liston's and Deas' customary hourly billing rate of $350.00 is reasonable. Multiplying the hours expended by the below-market hourly billing rate of $150.00 results in a lodestar of $58,740.00. For demonstration purposes, multiplying the same hours by Liston's and Deas' customary hourly billing rate of $350.00 results in a lodestar of $137,060.00.

Having determined the lodestar, the Court next considers whether the amount requires an upward or downward adjustment based upon the factors set forth in § 330(a)(3). In that regard, the method for calculating the lodestar and the § 330(a)(3) factors overlap. The Court previously addressed the first two § 330(a)(3) factors in its calculation of the lodestar. The remaining §330(a) factors are discussed separately below.

2.      § 330(a) Factors

a.      **Whether Services Were Necessary or Beneficial**

In the Fifth Circuit, the seminal case on the issue of whether professional fees should be considered necessary or beneficial to the administration of the estate is *Barron & Newburger, P.C. v. Tex. Skyline, Ltd. (In re Woerner)*, 783 F.3d 266 (5th Cir. 2015). The *Woerner* Court reviewed the text of § 330 and its legislative history and joined the majority of other Circuits Courts in adopting a prospective test that looks to the necessity or reasonableness of the professional services at the time they were rendered for determining whether services are compensable. *Id.* at 274-77. The *Woerner* Court overruled *Andrews & Kurth, L.L.P. v. Family Snacks, Inc. (In re Pro-Snax Distributors, Inc.)*, 157 F.3d 414, 426 (5th Cir. 1998), to the extent it required compensable professional services to actually result in an "identifiable, tangible, and material benefit to the bankruptcy estate." *Woerner*, 783 F.3d at 270. The Fifth Circuit in *Woerner* listed factors that bankruptcy courts "ordinarily consider" when determining whether professional services were necessary or beneficial at the time they were rendered: "the probability of success at the time the services were rendered, the reasonable costs of pursuing the action, what services a reasonable lawyer or legal firm would have performed in the same circumstances, . . . and any potential benefits to the estate (rather than to the individual debtor)." *Id.* at 276.

L&D's services resulted in a settlement under which the claims of Capitala/Harbert, McGlinn, and Harbert are subordinated to the allowed claims of all other creditors with respect to the Estate Funds and certain estate claims. Prior to the settlement, the Estate Funds constituted the cash collateral of Capitala/Harbert, and Capitala/Harbert had not given their consent to its use for any purpose. (Bankr. Dkt. 297). This settlement made the Estate Funds available for distribution

to other creditors and for other needs of the estate. L&D's services, therefore, substantially benefitted the estate.

The Court notes that there are no billing entries for time expended on pursuing the Trustee's Motion to Disqualify K&L Gates, LLP as Counsel for Capitala Defendants (Tr. Adv. Dkt. 190), which the Court ultimately denied. (Tr. Adv. Dkt. 352). That the Trustee was ultimately unsuccessful in seeking to have K&L Gates, LLP disqualified does not necessarily mean that the legal services provided by L&D were unnecessary or unreasonable at the time they were rendered. *Woerner*, 783 F.3d at 270. L&D's voluntary omission of these billing entries, however, renders it unnecessary for the Court to determine the extent to which those services benefitted the estate.

### b.   Whether Services Were Performed Within a Reasonable Amount of Time

The equitable subordination claim required the Trustee to prove that Capitala/Harbert engaged in inequitable conduct that harmed creditors of the bankruptcy estate or that conferred an unfair advantage on Capitala/Harbert. *Mobile Steel Co.*, 563 F.2d at 700. Such proof involved unwinding complex financial transactions and the actions of individuals acting in different corporate capacities. The lawsuit raised many issues that required extensive legal research. The Court finds that the services were performed in a reasonable time given the amount of investigation and research required.

### c.   Whether L&D Demonstrated Skill & Experience in the Bankruptcy Field

No evidence was presented to the Court that Liston and/or Deas are board certified in bankruptcy. Liston and Deas have appeared on many occasions in other proceedings and cases before this Court and other bankruptcy courts. They have demonstrated skill, experience, and professionalism on such occasions.

### d. Whether Compensation is Reasonable Based on Customary Compensation Charged by Comparably Skilled Practitioners in Non-bankruptcy Cases

This criterion, together with the similar sixth factor set forth in *Johnson*, requires the Court to consider the blended-fee structure. The District Court in *Adam Aircraft II* approved a hybrid combination of a reduced hourly fee and a reduced contingency fee based, in part, on its finding that the fee arrangement was customary in lender liability cases. The Court agrees with that finding. For example, the Fifth Circuit in *Campbell Harrison & Dagley, L.L.P. v. Hill*, 782 F.3d 240 (5th Cir. 2015), upheld an arbitration award approving a fee agreement that combined a high hourly-rate fee with a low-percentage contingent fee. *Id.*; *see also Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849 (5th Cir. 2004). Other jurisdictions have recognized fee contracts that combine both reduced hourly fees and a reduced contingent fee. *See, e.g., In re Hart Oil & Gas, Inc.*, No. 12-13558, 2016 WL 7377049 (Bankr. D.N.M. Dec. 7, 2016); *Marketfare Annunciation, LLC v. United Fire & Cas. Co.*, 06-7237, 2009 WL 3672758 (E.D. La. Oct. 30, 2009); *Arnal v Travelers Prop. Cas. Ins. Co.*, 2:04-cv-1563, 2007 WL 1412492 (D. Ariz. May 14, 2007); *Gibson v. Epting*, 827 S.E.2d 178 (S.C. Ct. App. 2019); *Storino, Ramello & Durkin v. Rackow*, 45 N.E.3d 307 (Ill. Ct. App. 2015); *Cotchett, Pitre & McCarthy v. Universal Paragon Corp.*, 114 Cal. Rptr. 3d 781 (Cal. Ct. App. 2010); *Chapman v. Hootman*, 999 S.W.2d 118 (Tex. Ct. App. 1999); *State v Cacioppo*, 813 P.2d 679 (Alaska 1991); *Kramer v. Fallert*, 628 S.W.2d 671 (Mo. Ct. App. 1981).

A hybrid fee structure alleviates the all-or-nothing risk of a straight contingent fee and allows clients to attract a broader range of counsel. Where the potential of recovery is doubtful, some counsel will not accept employment on a straight contingency basis. Adding a reduced hourly rate to the possibility of a contingent fee may render the arrangement more acceptable to

both the law firm and its client. This is the scenario that led to the JV Agreement.

The Trustee testified at the Hearing that she asked L&D to represent her on a contingent-fee basis but L&D declined to accept the full risk of pursuing complex and possibly protracted litigation without any flow of income from the provision of legal services. This risk of nonpayment is reflected in the JV Agreement. The 27.5% contingent fee is recoverable "provided that funds are available to pay [L&D at] accrued hourly rates." (Tr. Adv. 409-1 ¶ 4). If no funds are available to pay L&D the accrued hourly billings, then L&D "shall receive from any funds recovered on behalf of the estate a contingency fee of 40%" (Tr. Adv. Dkt. 409-1 ¶ 4). The reduced contingent fee meant that L&D bore some risk of nonpayment but not the full risk.

The blended-fee arrangement results in total fees of $156,693.81. In comparison, the total fees for the same number of hours expended at Liston's and Deas' customary billing rate of $350.00 results in fees of $137,060.00, a difference of only $19,633.81. The Court finds that this difference is a reasonable reward for accepting some of the risk of nonpayment.

An aspect of the UST's opposition to reverse contingent fees is the ability to calculate the reduction or savings. Indeed, as noted previously, the ABA Committee echoed the UST's concern when it opined that reverse contingent fees do not violate Model Rule 1.5 as long as the amount saved the client is reasonably determinable. *See supra* at 19. The L&D Fee Application explained the specific method used by L&D to calculate the contingency fee component of the total fees requested. L&D applied the reduced contingent fee of 27.5% to $356,195.69, the amount of the Estate Funds held by the Trustee subject to Capitala/Harbert's lien as of the date of the Hearing. This method mirrors the one used by Allen & Vellone in *Adam Aircraft II*. As in that matter, the cash in deposit in the account was preserved for distribution to creditors other than the litigants as a result of the settlement. Under these circumstances where the Trustee fully and affirmatively

supports the fee request and where the method used to calculate the amount of the savings to the estate is reasonable, the Court finds that the blended-fee structure resulting in $156,693.81 in fees is reasonable when compared to similar compensation in bankruptcy and non-bankruptcy matters.

3.      *Johnson* Factors

The *Johnson* factors overlap with the factors under § 330 and the method for calculating the lodestar.  The Court has already discussed the first and fifth *Johnson* factors in calculating the lodestar and the second, third, sixth, eighth, ninth and twelfth *Johnson* factors in discussing the factors under § 330.  The Court defers to its treatment of those factors in the foregoing discussion. The *Johnson* factors that remain are discussed separately below.

a.      **Preclusion of Other Employment**

As to the fourth *Johnson* factor, there is no evidence in the record as to how many cases L&D may have had to turn down to perform the necessary work in the Trustee Adversary.  Such information is not usually provided as part of a fee application.

b.      **Time Limitations Imposed by the Client or Circumstances**

The consolidation of the Trustee Adversary and the Mansfield Adversary for discovery and trial purposes required L&D to perform services in a prompt manner to protect the estate's interest. There was no emergency otherwise that would weigh in favor of awarding additional fees under this seventh *Johnson* factor.

c.      **Undesirability of the Case**

This tenth *Johnson* factor was mentioned briefly in the discussion under § 330 of the blended-fee structure.   The record reflects that the litigation against Capitala/Harbert was undesirable.  L&D, for example, declined to represent the Trustee on a straight contingent fee basis because the possibility of recovery was doubtful and the litigation would be protracted.

      **d.**      **Nature & Length of the Professional Relationship with the Client**

There is no evidence in the record about the Trustee's previous employment of L&D.

**4.**      **Summary**

The Court finds that the JV Agreement combines a reduced hourly fee and the potential for a straight or reverse contingent fee at lower percentage rate. The Court rejects the UST's argument at the Hearing that reverse contingent fees are per se invalid. The Court further finds that the total fees, both hourly and contingency-based, are reasonable under § 330(a)(3) and *Johnson*. In that regard, the Court notes that adding the reverse contingent fee of $97,953.81 to the hourly fees of $58,740.00 and dividing the sum by the 391.6 hours expended by Liston and Deas results in a billing rate calculation of approximately $400.00 per hour, which is within the market rate.

**D.**      **Expenses**

L&D requests the reimbursement of its expenses of $10,121.90. (Bankr. Dkt. 409-3). These expenses consist of deposition and postage costs. The UST does not challenge the reasonableness of these expenses. The Court finds that L&D may recover $10,121.90 in requested expenses.

<b>Conclusion</b>

For the above reasons, the Court finds that the Griffin Objection should be withdrawn, the UST Objection should be overruled, and the L&D Fee Application should be approved.

IT IS, THEREFORE, ORDERED that the Griffin Objection is hereby withdrawn.

IT IS FURTHER ORDERED that the UST Objection is hereby overruled.

IT IS FURTHER ORDERED that the L&D Fee Application is hereby approved. L&D is hereby awarded fees in the aggregate amount of $156,693.81, which consists of hourly fees of $58,740.00 and contingent fees of $97,953.81. L&D's payment of forty percent (40%) of any

contingent fees that L&D may receive to MMS is hereby approved.  L&D also is hereby awarded reimbursement of necessary and reasonable expenses of $10,121.90.

##END OF OPINION##